**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>*Plaintiff-Appellee,*<br>v.<br>DAVID STRUCKMAN,<br>*Defendant-Appellant.* | No. 08-30312<br>D.C. No.<br>2:04-CR-00229-<br>RMT<br>OPINION |

Appeal from the United States District Court
for the Western District of Washington
Robert M. Takasugi, District Judge, Presiding

Argued and Submitted
July 7, 2009—Seattle, Washington

Filed June 29, 2010

Before: Diarmuid F. O'Scannlain, Andrew J. Kleinfeld and
Marsha S. Berzon, Circuit Judges.

Opinion by Judge Berzon;
Concurrence by Judge Berzon

9365

## COUNSEL

Robert G. Bernhoft, The Bernhoft Law Firm, S.C., Milwaukee, Wisconsin, for the defendant-appellant.

John Dicicco, Alan Hechtkopf, and Gregory Victor Davis, United States Department of Justice, Washington, D.C., for the plaintiff-appellee.

## OPINION

BERZON, Circuit Judge:

David Struckman was indicted for massive tax fraud and was hiding out in Panama. United States agents helped arrange his expulsion from his chosen sanctuary, and he was handed over to federal officials for prosecution. Struckman maintains that the government's conduct, both in bringing him from abroad to stand trial in the United States and in its criminal investigation of him, warrants dismissal of the indictment with prejudice. In a painstakingly careful 83-page pretrial order, District Court Judge Takasugi[1] determined that the government had engaged in misconduct with regard to the investigation but not the expulsion from Panama. The District Court suppressed a great deal of evidence as a result of its finding of misconduct but ruled that dismissal of the indictment against Struckman was not an appropriate remedy. We agree that the broad suppression of evidence before trial was an adequate remedy for the misconduct found, disturbing as some of it was, and therefore affirm.

## I.

David Struckman was indicted in the Western District of Washington on May 11, 2004, for conspiracy to defraud the United States in violation of 18 U.S.C. § 371. The U.S. government later issued a superseding indictment, adding nine counts of tax evasion under 26 U.S.C. § 7201.

The superseding indictment alleged that Struckman was a co-founder of an organization called the Institute of Global Prosperity. From 1996 to 2002, Global Prosperity offered, for a fee and through middlemen called "Qualified Retailers," an audiotape/CD series and seminars. These products advocated the use of illegal means to avoid paying income tax, including

---

[1]Judge Takasugi is now deceased.

"voluntary withdrawal" from the United States' jurisdiction and the placement of assets in purported foreign or common law trusts without relinquishing control of them. The indictment alleged that Struckman purchased bogus trusts and fraudulently established bank accounts to receive profit distributions from Global Prosperity's more than $40 million in gross receipts, and that Global Prosperity and Struckman never reported these distributions to the Internal Revenue Service ("IRS") as income.

At some point, Struckman, a U.S. citizen, went to the Republic of Panama on a tourist visa and stayed. The U.S. government vigorously sought Struckman's return to the United States to stand trial.

Before trial, Struckman filed motions to dismiss the indictment based on alleged due process violations or the district court's supervisory powers. The motions focused on asserted illegalities and misconduct during the government's efforts to secure his return from Panama but also relied on alleged misconduct during the criminal investigation in the United States. The district court held an evidentiary hearing on the motions and issued extensive factual findings, none of which is contested by the government on appeal. We begin by describing in detail the government's conduct as found by the district court.

## A.   Struckman's Departure from Panama

After Struckman went to Panama, U.S. government officials developed a plan for his return. Timothy O'Brien, at that time the regional security officer at the U.S. Embassy in Panama City, Panama, was the central person involved in the efforts to bring Struckman back to the United States for trial. In a 2004 e-mail to a Department of Justice ("DOJ") trial attorney, O'Brien summed up the plan that had been developed:

What we're hoping to do is find [Struckman] and have him deported vice [sic] going the provisional arrest warrant route. The reasons for this are simple — a [provisional arrest warrant] will mean that extradition proceedings begin . . . .[2] There's a Section of the [Code of Federal Regulations] . . . that allows the [U.S. government] to revoke a passport of an individual who is the subject of an outstanding Federal Felony arrest warrant — which Struckman has. We know he's got a U.S. [passport], and if we revoke it he's undocumented. Which means he's immediately deportable.

There's also the possibility that the Panamanians can decide he's an undesirable and revoke his visa . . . . We just had a meeting with the Panamanian National Police . . ., and provided information that we hope will assist them in finding him . . . .

On August 25, 2004, Panama's National Director for Immigration and Naturalization ("the Director") issued two resolutions regarding Struckman's immigration status. One resolution denied Struckman's pending request to obtain an immigrant visa. It stated that the Panamanian government had considered a "note" it received from the U.S. District Court regarding the charge for conspiracy to defraud the United States.[3] The resolution gave Struckman thirty days to leave the country.

---

[2]Under Article IV of the extradition treaty between the United States and Panama, when the United States seeks the extradition of a fugitive in Panama, "the proper course shall be to apply to the Foreign Office, which will immediately cause the necessary steps to be taken in order to secure the provisional arrest or detention of the fugitive." Providing for the Extradition of Criminals art. IV, U.S.-Pan., May 25, 1904, 34 Stat. 2851. Once the provisional arrest is made, the United States must within two months make a formal request for surrender and produce "the necessary evidence of [the defendant's] criminality," or else the defendant will be released. *Id.*

[3]The language of the resolution suggests but does not establish that this "note" was the arrest warrant the district court had issued for Struckman.

The companion resolution stated that Struckman was "wanted by the judicial authorities of the United States of America, in virtue of the fact that he ha[d] a warrant for his arrest pending for federal charges, being, as a result, a fugitive from United States justice." Relying on Panamanian Law No. 16 of June 30, 1960, Article 37, the resolution stated that "[i]mmigration to the country of a foreign national is prohibited . . . [for] all persons with criminal records, such as fugitives and those sentenced or defendant in common crimes." The resolution ordered the arrest of Struckman "for reasons of security and public order."

On June 23, 2005, O'Brien sent an e-mail to IRS Special Agent Michael D. Hardaway about how quickly Struckman could be obtained from Panama. He noted that Struckman "may be able to get a lawyer to slow things down (but that's a big reason we want to move quickly if we nab him — we don't want to give him that chance, especially with that much money available to him)." In a letter later that summer to Panamanian officials, O'Brien stated that Struckman was charged with "defrauding investors of over $50 million" and that he was attempting to perpetrate the "same kind of fraud scheme that he used with such success in the U.S." in Panama. O'Brien had no factual basis for making this statement.

Shortly before Struckman was arrested by Panamanian authorities, O'Brien discussed the plan for the "expulsion" of Struckman with a DOJ trial attorney via e-mail. He stated that "[w]hat we have set up, and still in place, is a [passport] revocation letter to be served on Struckman whenever he gets arrested" and that "[w]e also have a deportation/expulsion letter from Panamanian Immigration ready to go." As to the delay, O'Brien noted that the plan had been "in place for a while, it's just putting the habeas grabbus on [Struckman] that's holding up executing everything."

On January 11, 2006, the Panamanian National Police contacted O'Brien to report that police officers had arrested a

man who might be David Struckman. O'Brien responded that Struckman "[had been] sentenced and at this moment is a fugitive of the federal authorities and is [awaiting] to serve his sentence." The statement was clearly not true; Struckman had not yet been tried.

As planned, that same day, the U.S. Department of State revoked Struckman's passport and a Panamanian arrest order issued for Struckman's failure to "maintain[ ] his legal documents in the national territory." Struckman's counsel in Panama immediately filed a habeas corpus lawsuit in Panamanian court.

The following day, O'Brien sent a fax to Mark Odulio, a federal prosecutor involved in the Struckman case. He informed Odulio that "[a] lawyer for Struckman came sniffing around police [headquarters] this morning, the race has begun[.] [T]he P[anamanian] N[ational] P[olice] ha[ve] turned Struckman over to immigration, so they'll refer the lawyer to them some time today." One day later, the district court found, "Struckman was deported from Panama."

Panama's Supreme Court of Justice issued an opinion in Struckman's habeas case several months after Struckman was removed from the country. The opinion set forth information from the Director, including that Struckman's "*deportation* from the national territory [was] *made effective* on January 13, 2006." (Emphasis in original.) The Panamanian Court held that it could "not pronounce regarding the legality of [Struckman's] arrest . . . because [Struckman was then] outside the jurisdiction of Panama, due to the fact that he was deported in compliance" with a 2004 resolution providing for such measures.

## B.   The U.S. Government's Investigation of Struckman

The IRS's criminal investigation of Struckman dates at least to 2000. Struckman's claims of government investiga-

tory misconduct focus on the actions of two IRS Special Agents, Keith L. Chinn and Michael D. Hardaway (the latter mentioned earlier in connection with Struckman's transfer from Panama), as discussed below.

### (1)   Confidential informant "Ted"

Chinn was assigned in 2000 "to do some background information on" Struckman for an investigation of the Global Prosperity program. He made rough notes in September of that year about a meeting with an anonymous informant he designated "Ted." Chinn's notes indicate that "Ted" divulged personal information about Struckman, including addresses, marital history, a bank account number used by Struckman or his daughters, and other information about Struckman's family. On at least eight later occasions between September 2000 and December 2001, Chinn made rough, contemporaneous notes about additional conversations with "Ted." He did not generate contemporaneous Memoranda of Investigation ("MOIs"), the proper format for documenting agents' contacts with informants, to memorialize these contacts. The information attributed to "Ted" in the notes is wide-ranging, including Social Security numbers for members of Struckman's family, license plate numbers for vehicles at Struckman's home, locations of safe deposit boxes, and Struckman's daughter's plan to move to a new residence, including her new address.

In March of 2001, Hardaway wrote an MOI detailing a conversation with "Ted," the same confidential informant with whom Chinn had been in contact. Between April 17, 2001, and December 12, 2001, Hardaway wrote MOIs for nineteen additional contacts with "Ted." In addition to personal information about Struckman's family, the MOIs and rough notes used to produce them "include[d] reaction to grand jury appearances by [Struckman and his daughter], reaction to subpoenas by family members, Social Security Numbers, addresses to residences, expenditures, phone and

fax numbers, transfer of funds, and arguments and marital problems among the family."

On December 17, 2001, Hardaway sent an e-mail to Chinn requesting that he "finally finish those memos" regarding the information obtained from "Ted," because Hardaway was "being asked[ ] by the attorneys" for the memos. Chinn later testified that he eventually generated after-the-fact MOIs for his contacts with "Ted," although he did not specify when he did so. It is clear, however, that Chinn never produced additional MOIs for contact with "Ted" occurring *after* the December 2001 e-mail, and Hardaway produced only two more, dated January 3 and 8, 2002. Nonetheless, Hardaway and Chinn continued to attribute later-acquired information, including information that Struckman was in Panama and about his activities there, to "Ted" well after January 8, 2002.

Suspicious as to whether "Ted" existed, defense counsel before trial sought to discover "Ted"'s identity, arguing "that unless ["Ted"] is in a very close relationship with defendant, the government would not have been able to obtain such information but for the use of illegal wiretaps." The district court concluded that Struckman had made the requisite minimal threshold showing that the identity of "Ted" would be relevant to a defense of governmental misconduct requiring dismissal, and so ordered the government to produce "Ted" for an *in camera* hearing with the district judge. But, "Ted" proved catastrophe-prone: When Hardaway tried to serve the putative "Ted" with a subpoena for the hearing, he was told that the informant had recently fallen off a roof and might not be able to travel due to medical problems.

Stymied in its attempt to interview "Ted," the court ordered the government to file "a declaration stating the identity of ["Ted"], describing his/her connection to defendant Struckman and how the informant came about his/her knowledge concerning [the] defendant." The response, filed by Department of Justice Tax Division trial attorneys Mark Odulio and

Larry Wszalek, came in the form of MOIs by Chinn and Hardaway, not declarations from Chinn and Hardaway under penalty of perjury. The so-called MOIs were dated the same day as the government's response was filed in the district court, so were not contemporaneous in any sense. In his MOI, Hardaway represented that he had confirmed the identity of the informant as Gary D. Moritz, who had indeed fallen from a roof and who was the husband of Struckman's first wife, Bonnie Moritz. The government also submitted from Gary Moritz an unsworn statement that he had no recollection of any of the information that the government attributed to him.

Concerned that the filing did not include any declarations under penalty of perjury from the agents who knew "Ted"'s identity, the district court issued a second order requiring the government to produce a declaration regarding "Ted"'s identity. This time the government filed a document denominated by attorneys Odulio and Wszalek in their filing as a "declaration," signed by Hardaway and Chinn but not under penalty of perjury. In the document, Hardaway and Chinn stated that "Ted" was Gary Moritz and asserted that they believed Moritz received most of the information from discussions at family gatherings or by listening to conversations between his wife, Bonnie Moritz, and her daughters with her ex-husband David Struckman.

In response, Struckman filed declarations under penalty of perjury by Gary Moritz, Bonnie Moritz, and one of Struckman's daughters, Jennifer Wininger. Gary Moritz stated that he did not recall giving information about Struckman to Hardaway and did not remember Struckman. Moritz's wife and Struckman's daughter denied ever knowing much of the information attributed to Moritz. Also, the district court found, "Bonnie Moritz contradict[ed] almost every single statement attributed to her husband as ["Ted"] . . . , and in addition, state[d] that she and Jennifer discussed over the phone much of the private, family related information attributed to Gary as

["Ted"] and that she believed her 'phones were tapped in some manner during this time.' "

**(2)   Government relationship with Dave Bowden**

In its investigation, the IRS also relied on Dave Bowden, operator of a car cleaning business, who met Struckman in 1996 when Struckman brought in several cars to be cleaned. Bowden told the IRS that Struckman used $30,000 in cash to buy a car from Bowden and boasted that he sent his wife to the bank nearly every day to withdraw an amount under $10,000. In a grand jury proceeding in 2003 concerning Struckman's wife, Laura, Bowden testified that he had given documents taken from Struckman's car to Hardaway.

Before trial, Struckman moved to compel disclosure of material concerning Dave Bowden, including Bowden's tax returns, audit file, "motivation for illegal black bag operations at the behest of the government," and "past acts of perjury on tax forms." The government at first denied that Bowden had been audited by the IRS, did not produce Bowden's tax returns, and denied that Bowden had given photocopies of papers that he had taken from Struckman's car to Hardaway or any other IRS agents.

As it turned out, Bowden had in fact received notice of an audit from the civil division of the IRS in 2004 and contacted Hardaway about it soon afterwards. Hardaway then had contact with the auditor about Bowden's audit, but never memorialized either his contact with Bowden or that with the auditor at the time, waiting until two days after the court-ordered motion to compel—nearly three years after the contact—to do so. Hardaway asserted that he had told the prosecutors "on several occasions," the last time on the day after the court order compelling disclosure of information about Bowden's audit, about his contacts. In declarations under penalty of perjury submitted to the district court, attorneys Wszalek and Odulio each acknowledged Hardaway's post-disclosure order

statement to them, but said that he did not recall any earlier disclosure by Hardaway about the audit contacts. One day after the court's order compelling disclosure and the same day as Hardaway's last disclosure to the prosecutors, the government changed its stance: The government "acknowledged it had made a 'misstatement' concerning the existence of an audit on Bowden" and that it had other exculpatory information concerning Bowden's contact with IRS agents.

Additionally, Bowden told IRS criminal investigation agents that he had taken documents from Struckman's car in 1996 or 1997, on his own initiative, and that he had later given those documents, along with others Struckman had given directly to Bowden, to Hardaway. Bowden also recalled telling Hardaway how he had obtained the documents.

At the evidentiary hearing on the motion to dismiss, Hardaway continued to recall some contact with the IRS auditor but denied—contrary to testimony by the IRS agent assigned to audit Bowden—any recollection of an in-person meeting with the auditor about Bowden's audit or of giving the auditor access to records that Bowden had given to Hardaway. He also initially denied any recollection of receiving the documents taken from Struckman's car by Bowden. Only when Struckman's counsel demanded them did Hardaway "remember" the existence of a box of documents related to the case that he had inexplicably kept apart from the other case documents.

## C. Struckman's Motions to Dismiss

After the evidentiary hearing on the motions to dismiss, the district court issued an 83-page order denying the motions. The district court first rejected Struckman's argument that the court did not have personal jurisdiction over him because of the manner in which he was brought from Panama, relying on the *Ker/Frisbie* doctrine. That doctrine provides generally that "the manner by which a defendant is brought to trial does not

affect the government's ability to try him." *United States v. Matta-Ballesteros*, 71 F.3d 754, 762 (9th Cir. 1995) (citing *Ker v. Illinois*, 119 U.S. 436, 444 (1886) and *Frisbie v. Collins*, 342 U.S. 519, 522 (1952)), *cert. denied*, 519 U.S. 1118 (1997). Struckman maintained that Panama had actually extradited, not deported him, and that the extradition did not comply with the Extradition Treaty between Panama and the United States, in which case the *Ker*/*Frisbie* doctrine would not apply.

As to Struckman's motion to dismiss the indictment on grounds of misconduct in the investigation and in responding to discovery, the district court declared that the government had indeed committed serious *Brady*/*Giglio* violations.[4] First, as to the informant "Ted," the district court found that information regarding the identity of the informant submitted by Hardaway and Chinn right before trial was "remarkably different from their previous statements when it comes to details." Disbelieving the agents' ultimate submissions, the court concluded that:

> [T]he sheer volume of discrepancies in the testimony of the agents who claim to have handled the informant, the degree of irregularities in the record concerning the alleged informant, as well as the uncontested testimony of [Bonnie Moritz and Jennifer Wininger] that Gary Moritz could not have been the informant, lead the court to find that there was no single source of information for all the information attributed to "Ted," and that the source of all that information could not have been Gary Moritz.

[4]Under *Brady v. Maryland*, prosecutors have a duty to divulge to the defense before trial "evidence favorable to an accused." 373 U.S. 83, 87 (1963). *Giglio v. United States* likewise requires prosecutors to disclose to the defense any "understanding or agreement as to a future prosecution" the government has made with a trial witness. 405 U.S. 150, 154-55 (1972).

. . . .

> While in isolation all these discrepancies could very well be attributed to sloppy record keeping, faulty memories, simple misstatements or minor omissions, in the aggregate, they add to nothing more than a house of cards built to support the illusion of the existence of ["Ted"].

Regarding the Bowden information, the district court similarly found that the government had been considerably less than forthcoming. There was a "secret deal" between Hardaway and Dave Bowden, the district court found, pursuant to which "[n]ot only was Bowden not prosecuted [on tax-related charges], but in return for his testimony in the Laura Struckman trial, and in the upcoming trial of David Struckman, . . . Hardaway prevented a proper audit of Dave Bowden by the civil branch of the IRS." Also, the district court concluded that "[w]hile it may be a coincidence that the box of documents Bowden gave to SA Hardaway [was] simply kept out of the knowledge of the prosecutors, it is more likely that SA Hardaway was trying to maintain those records separate from the investigatory file in this case." Because "the government ha[d] yet to produce the documents Bowden took and copied from defendant's cars," the court went on to declare that "given the pattern of misconduct in the case, . . . the government should not be allowed to introduce[ ] those documents at trial."

Despite its strong condemnation of the government and its finding of *Brady/Giglio* violations, the district court rejected Struckman's motion to dismiss on *Brady/Giglio* grounds. Instead, the court excluded evidence attributed to "Ted," precluded Bowden from appearing as a witness at trial, excluded all evidence Bowden had taken from Struckman's car, and required the government to assure that the evidence produced at trial was not "derived from suppressed evidence." The district court did not make any finding as to whether the

prosecutors—as opposed to the IRS investigators—engaged in affirmative misconduct.

Struckman proceeded to trial. O'Brien, Hardaway, and Chinn did not testify. Struckman was convicted of one count of conspiracy to defraud the United States under 18 U.S.C. § 371 and three counts of income tax evasion under 26 U.S.C. § 7201. He was sentenced to 70 months imprisonment and ordered to pay more than $2.9 million in restitution. The trial court never made further inquiry into the actual sources of the information attributed to "Ted," and the government never revealed them.

Struckman now appeals the district court's denial of his motions to dismiss the indictment.

## II.

### A.   Jurisdictional Challenge

We first consider whether the district court lacked personal jurisdiction over Struckman because of the manner in which he was brought to the United States. "Jurisdictional issues are reviewed de novo, as are challenges to personal jurisdiction based on the alleged violation of an extradition treaty between the United States and another country." *United States v. Anderson*, 472 F.3d 662, 666 (9th Cir. 2006) (internal citation omitted).

Our starting point is the venerable principle that "the manner by which a defendant is brought to trial does not affect the government's ability to try him." *Matta-Ballesteros*, 71 F.3d at 762 (citing *Ker*, 119 U.S. at 444, and *Frisbie*, 342 U.S. at 522). We have, however, recognized exceptions to the *Ker/Frisbie* doctrine "if either: (1) the transfer of the defendant violated the applicable extradition treaty, or (2) the United States government engaged in 'misconduct of the most shocking and outrageous kind' to obtain his presence." *Ander-*

*son*, 472 F.3d at 666 (quoting *Matta-Ballesteros*, 71 F.3d at 764 (internal citations omitted)).

## (1)   Violation of the Extradition Treaty

Seeking to come within the first *Ker/Frisbie* exception, Struckman maintains that he was taken from Panama to the United States in violation of the extradition treaty between the United States and Panama, and that dismissal is therefore required. *See* Providing for the Extradition of Criminals, U.S.-Pan., May 25, 1904, 34 Stat. 2851 ("Extradition Treaty"). We do not agree.

**[1]** The U.S. government was indisputably involved in efforts to convince Panamanian authorities to deport Struckman and facilitate his return. But persuasion and cooperation do not necessarily add up to extradition. "Neither deportation nor surrender other than in response to a demand pursuant to Treaty constitutes extradition." *Oen Yin-Choy v. Robinson*, 858 F.2d 1400, 1404 (9th Cir. 1988). Nations may in practice alter the process for extradition requests, but "[w]hile the formalities of extradition may be waived . . ., a demand in some form by the one country upon the other is required, in order to distinguish extradition from the unilateral act of one country, for its own purposes, deporting or otherwise unilaterally removing unwelcome aliens." *Stevenson v. United States*, 381 F.2d 142, 144 (9th Cir. 1967) (internal citation omitted); *see also* MICHAEL ABBELL, EXTRADITION TO AND FROM THE UNITED STATES § 7-2(2)-(4) (2008) (describing alternatives to extradition of criminal defendants, such as a request by the United States to another country for formal or "informal" deportation or, for U.S. citizens, passport revocation).

**[2]** The government did not demand Struckman's surrender pursuant to the Extradition Treaty; indeed, the record reveals that the government went to great lengths to avoid doing so.[5] Moreover, the Panamanian government in its Reso-

---

[5]It is unclear whether the United States could have had Struckman extradited under the terms of the Extradition Treaty, which does not list

lutions expressly relied on its own interests in deporting Struckman, not its responsibilities under the Extradition Treaty. As Struckman was not extradited, his argument that his "extradition" was not in compliance with the procedures set forth in the treaty fails.

**[3]** Although Struckman was not extradited, his transfer to the United States could still be prohibited by the Extradition Treaty, *see United States v. Alvarez-Machain*, 504 U.S. 655, 662 (1992), if, for example, the Extradition Treaty made extradition the exclusive means to effect the cooperative transfer of a criminal defendant. In considering whether that was so here, we begin by looking to the Extradition Treaty's express terms. *See Alvarez-Machain*, 504 U.S. at 663. As in *Alvarez-Machain*, the Extradition Treaty does not provide that extradition is the exclusive means for one signatory to obtain a criminal defendant or fugitive from the territory of the other.[6] *Compare* Providing for the Extradition of Criminals, U.S.-Pan., May 25, 1904, 34 Stat. 2851, *with* Extradition Treaty, May 4, 1978, U.S.-Mex., 31 U.S.T. 5059. In the Treaty with Panama, the signatories "agree to deliver up persons who, having been charged with or convicted of any of the crimes

---

tax evasion or tax fraud among the offenses for which extradition is proper. *See* Providing for the Extradition of Criminals, U.S.-Pan., art. II, May 25, 1904, 34 Stat. 2851.

[6]Struckman contends that *Alvarez-Machain* is of "no precedential value" any longer because the treaty there at issue, between the United States and Mexico, has been modified to prohibit abductions such as occurred in *Alvarez-Machain*. *See* Treaty To Prohibit Transborder Abductions, Nov. 23, 1994, U.S.-Mex., *reprinted in* MICHAEL ABBELL, EXTRADITION TO AND FROM THE UNITED STATES, at A-303 (2008). In fact, that 1994 agreement is not in force. *See* UNITED STATES DEP'T OF STATE, TREATIES IN FORCE: A LIST OF TREATIES AND OTHER INTERNATIONAL AGREEMENTS OF THE UNITED STATES IN FORCE ON JANUARY 1, 2009, at 174-82 (2009), *available at* http://www.state.gov/documents/organization/123747.pdf. In any event, we are still bound to follow *Alvarez-Machain*'s framework for analyzing whether a treaty permits certain methods of obtaining jurisdiction over a defendant located abroad. *See, e.g., Anderson*, 472 F.3d at 666.

and offenses specified in [the Extradition Treaty] . . . shall seek . . . asylum or be found within the territories of the other." *See* Providing for the Extradition of Criminals, U.S.-Pan., art. I, May 25, 1904, 34 Stat. 2851. But what the countries are required to do when one signatory invokes the Treaty does not limit what they may agree to do cooperatively. Nowhere does the Treaty curtail the prerogative of Panama to deport U.S. citizens, nor does it "bar[ ] the signatories from informally cooperating with each other as they did in this case." *United States v. Mejia*, 448 F.3d 436, 443 (D.C. Cir. 2006), *cert. denied*, 127 S. Ct. 989 (2007).**[7]**

**[4]** We hold that the Treaty does not prohibit the use of means other than extradition to obtain a defendant's presence in the United States and did not bar Struckman's transfer to the United States. In so doing, we join all other circuits to have considered this issue concerning the reach of the Extradition Treaty with Panama. *See Mejia*, 448 F.3d at 443; *United States v. Noriega*, 117 F.3d 1206, 1213 (11th Cir. 1997); *United States v. Cordero*, 668 F.2d 32, 37-38 (1st Cir. 1981).

## (2)   Shocking and outrageous government conduct

**[5]** Struckman next attempts to fit his quest for mandatory dismissal into the second exception to the *Ker/Frisbie* rule: Where the Government's conduct to obtain a defendant's presence is so shocking and outrageous "as to violate the universal sense of justice," *United States v. Barrera-Moreno*, 951 F.2d 1089, 1092 (9th Cir. 1991) (internal quotations omitted), the means of obtaining jurisdiction over the defendant

---

**[7]**As a result, it is irrelevant under the Treaty whether Struckman was formally deported or was instead transferred cooperatively by other means to the United States, as neither is prohibited. Struckman's argument that his "deportation" was not in compliance with Panamanian deportation law is unavailing. As we need not review the propriety of the deportation under Panamanian law, we do not consider, as did the district court, the implications of the act of state doctrine.

amounts to a due process violation, and dismissal is required. *See Anderson*, 472 F.3d at 666.**8** The government's conduct meets this standard, Struckman argues, because the U.S. government interfered with his Sixth Amendment right to counsel while in Panama and induced the Panamanian government to deport him by making misrepresentations regarding his criminal status in the United States.

We review de novo the district court's denial of Struckman's motion to dismiss the indictment based on outrageous government conduct in connection with the government's efforts to secure Struckman from Panama. *See United States v. Holler*, 411 F.3d 1061, 1065 (9th Cir. 2003). "[W]e view the evidence in the light most favorable to the government and we accept the district court's factual findings unless they are clearly erroneous." *United States v. Gurolla*, 333 F.3d 944, 950 (9th Cir.), *cert. denied*, 540 U.S. 995 (2003).

**[6]** We agree with the district court that dismissal was not required under the second *Ker/Frisbie* exception. Some of the government's actions in Panama are quite disturbing, particularly the flat misstatements to Panamanian authorities. But a comparison to the circumstances in other cases in which the outrageous conduct exception was held inapplicable makes clear that the governmental conduct here does not meet the "extremely high standard" required for dismissal under the

---

**8**Our case law has been less than clear about the vitality of the "shocking and outrageous conduct" defense as a basis for mandatory dismissal. In *Matta-Ballesteros*, this Court appeared to disapprove in a footnote the second exception to the *Ker/Frisbie* doctrine for "shocking and outrageous conduct," and examined this defense only as a basis for discretionary dismissal under a court's supervisory powers. *See* 71 F.3d at 763 n.3, 764. However, eleven years later, this Court examined a "shocking and outrageous conduct" defense as a basis for mandatory dismissal, citing *Matta-Ballesteros* approvingly. *Anderson*, 472 F.3d at 666. As we find that the government's conduct was not shocking and outrageous under the standard applied in *Anderson*, this tension in our case law does not affect our holding.

outrageous conduct / due process defense. *United States v. Smith*, 924 F.2d 889, 897 (9th Cir. 1991).

The involvement of U.S. government agents in facilitating the expulsion of Struckman from Panama and receiving him in the United States surely does not meet this standard. We have previously held, for example, that abduction of a defendant by U.S. Marshals from the defendant's home was not so shocking and outrageous as to warrant dismissal. *See Matta-Ballesteros*, 71 F.3d at 761, 763.

[7] The lies told by O'Brien to Panamanian officials are considerably more troubling than other aspects of U.S. governmental involvement in Panama. We are not prepared to say that blatant lies to a foreign government that induce the foreign government to transfer a defendant to the United States when it otherwise would not could never amount to conduct so shocking and outrageous as to violate due process and require dismissal of pending criminal proceedings in the United States. In this case, though, the district court found that O'Brien's misrepresentations came after the Panamanians had already decided to cooperate with the United States in returning Struckman and had issued the resolutions. So the Panamanians did not rely on these misrepresentations for that purpose. Also, Struckman was deported after his passport was revoked, which provided a separate reason for deportation under Panamanian law, in addition to those covered in the resolutions.

[8] In *Anderson*, we declined to apply the *Ker/Frisbie* shocking and outrageous conduct exception because Costa Rica's decision to extradite the defendant was not dependent on "representations made by United States government agents to Costa Rican authorities [that] may have misled Costa Rica into believing [the defendant] had an unserved prison sentence." 472 F.3d at 667. Here, similarly, Struckman has not demonstrated prejudice from O'Brien's misstatements, so

there was no due process violation justifying dismissal of the charges.

Nor does it matter whether Struckman had a right under Panamanian law to appeal the deportation order against him or pursue a habeas proceeding. *Anderson* held in nearly identical circumstances that government behavior does not become outrageous because a defendant is removed from a foreign country pending his right of appeal. *See id.*

## B. Dismissal Using Supervisory Powers

**[9]** Our rejection of Struckman's outrageous conduct/due process claim does not end our inquiry into the denial of the motion to dismiss because of the manner in which Struckman was brought to the United States from Panama. Even "if the [government's] conduct does not rise to the level of a due process violation, [a] court may nonetheless dismiss [an indictment with prejudice] under its supervisory powers." *United States v. Chapman*, 524 F.3d 1073, 1084 (9th Cir. 2008) (internal quotations and brackets omitted). Courts may dismiss an indictment under their inherent supervisory powers "(1) to implement a remedy for the violation of a recognized statutory or constitutional right; (2) to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury; and (3) to deter future illegal conduct." *Matta-Ballesteros*, 71 F.3d at 763 (citing *United States v. Simpson*, 927 F.2d 1088, 1090 (9th Cir. 1991)).[9] The

---

[9]*Matta-Ballesteros* indicated that these three reasons were the "only . . . legitimate" bases for the exercise of a court's supervisory powers. 71 F.3d at 763 (relying on *Simpson*, 927 F.2d at 1090, and *United States v. Hasting*, 461 U.S. 499, 505 (1983)). More recently, in *United States v. W.R. Grace*, we disapproved the exclusivity of these grounds and concluded that "[t]here is nothing in [*Hasting*] that limits the inherent powers to these three areas." 526 F.3d 499, 511 n.9 (9th Cir. 2008) (en banc) (internal alteration and quotation marks omitted). In so doing, we held that a court's supervisory powers extended to the authority to issue a pre-trial enforcement order to divulge a witness list. *Id.* at 513. We need not further consider the scope of the supervisory power after *W.R. Grace*, however, because Struckman argued before the district court only the three grounds for dismissal recognized in *Matta-Ballesteros*.

defendant must demonstrate prejudice before the court may exercise its supervisory powers to dismiss an indictment. *See Bank of Nova Scotia v. United States*, 487 U.S. 250, 255 *(1987); United States v. Ross*, 372 F.3d 1097, 1110 (9th Cir. 2004) (citing *United States v. Tucker*, 8 F.3d 673, 674-75 (9th Cir. 1993) (en banc)); *United States v. Rogers*, 751 F.2d 1074, 1077 (9th Cir. 1985).

We review for abuse of discretion the district court's denial of Struckman's motion to dismiss based on the court's supervisory powers. *Ross*, 372 F.3d at 1109.

### (1) Violation of a recognized statutory or constitutional right

[10] "Dismissal is appropriate when the investigatory or prosecutorial process has violated a federal constitutional or statutory right and no lesser remedial action is available." *Barrera-Moreno*, 951 F.2d at 1092. This Court has also suggested that a violation of *jus cogens* norms of international law might serve as a basis for dismissal. *Matta-Ballesteros*, 71 F.3d at 764 n.5. Struckman argues that the government violated his constitutional right to counsel and rights under *jus cogens* norms. We disagree.

#### (a) Right to counsel

[11] O'Brien's actions in Panama did not violate Struckman's right to counsel. Struckman did retain counsel, who filed a habeas petition on Struckman's behalf shortly after Struckman's arrest. Moreover, O'Brien's own e-mail to a DOJ prosecutor, dated the day before Struckman's removal from Panama, stated that the Panamanian National Police had "turned Struckman over to immigration, so [the Police will] refer the lawyer to them some time today," indicating that the expectation was that Struckman would have a chance to confer with counsel. Nor has Struckman introduced evidence that he asked for and was refused the opportunity to consult with

retained counsel with regard to any pending or possible future proceedings, while he was in Panama or otherwise. Although there was certainly an effort to get Struckman out of the country before he had a chance to obtain a ruling from a court preventing his removal, that effort was not itself a denial of a right to counsel.

In short, there simply is no evidence that O'Brien denied Struckman's asserted right to counsel, in the United States or abroad. We therefore need not consider the extent to which an individual outside the country enjoys federal constitutional protection of a right to counsel with respect to civil proceedings instituted by a foreign country in cooperation with the United States.

### *(b)* Jus cogens *norms*

Struckman next argues that dismissal is appropriate under the court's supervisory authority because the government violated *jus cogens* norms of international law, namely "violations of the right to habeas corpus in a foreign land, the right to counsel, the right to due process and the right of access to the courts."

[12] *Jus cogens* norms are a subset of "customary international law"; "customary international law" is defined as the " 'general and consistent practice of states followed by them from a sense of legal obligation.' " *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 714 (9th Cir. 1992) (quoting RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES § 102(2) (1987)). These norms, which are "derived from values taken to be fundamental by the international community," *id.* at 715 (internal quotation omitted), "are binding on all nations, and can not be preempted by treaty," *Matta-Ballesteros*, 71 F.3d at 764 n.5. We have suggested that violation of *jus cogens* norms could provide a basis for dismissal under a court's supervisory powers because, like

statutory and constitutional laws, they are justiciable in our courts. *Id.*

**[13]** Although he makes a general *jus cogens* assertion, Struckman has not developed the argument at all. "Courts ascertain customary international law 'by consulting the works of jurists, writing professedly on public law; or by the general usage and practice of nations; or by judicial decisions recognizing and enforcing that law,' " *Siderman de Blake*, 965 F.2d at 714-15 (quoting *United States v. Smith*, 18 U.S. (5 Wheat.) 153, 160-61 (1820)), and must ask "whether the international community recognizes the norm as one 'from which no derogation is permitted,' " *id.* at 715 (quoting *Comm. of U.S. Citizens Living in Nicaragua v. Reagan*, 859 F.2d 929, 940 (D.C. Cir. 1988)). Despite this fairly exacting standard, Struckman has not provided *any* international law materials concerning the *jus cogens* rights he asserts, much less materials that address the application of the asserted rights under the circumstances of this case. In this sensitive and complex area, we decline to create out of whole cloth the detailed legal arguments, or discover on our own the array of international materials, that would be necessary to support Struckman's "bare assertion[s]." *Greenwood v. Fed. Aviation Admin.*, 28 F.3d 971, 977 (9th Cir. 1994).[10]

### (2) Preservation of judicial integrity and deterrence of illegal government conduct

**[14]** Having determined that dismissal was not appropriate based on a violation of Struckman's rights, we next consider whether dismissal might be appropriate to preserve judicial

---

[10]In his opening brief, Struckman also makes passing references to violations of "treaties" providing a right to counsel, due process, and access to the courts. Because he does not argue "specifically and distinctly in [his] opening brief" which treaties so provide and were therefore violated, we do not consider his vague assertion here either. *Greenwood*, 28 F.3d at 977.

integrity or deter illegal government conduct. While a court may dismiss a prosecution "to preserve judicial integrity," *Matta-Ballesteros*, 71 F.3d at 763, it does not under this rubric "have the authority to supervise out-of-court executive procedure in the absence of a constitutional or statutory violation." *Barrera-Moreno*, 951 F.2d at 1092 (citing *Simpson*, 927 F.2d at 1090); *see also Simpson*, 927 F.2d at 1091 ("The supervisory power comprehends authority for the courts to supervise their own affairs, not the affairs of the other branches; rarely, if ever, will judicial integrity be threatened by conduct outside the courtroom that does not violate a federal statute, the Constitution or a procedural rule."). Moreover, to dismiss an indictment on this basis, a court must find that the prosecutorial misconduct was "flagrant." *Id.* at 1091. Similarly, a finding that the government has broken the law in the past is a necessary predicate to dismissal on the basis of deterrence of illegal government conduct. *See id.*

**[15]** We have already concluded that the district court did not abuse its discretion in holding that Struckman has not established any violation of U.S. laws or *jus cogens* norms in securing Struckman for trial. The court made no finding, either, of prosecutorial misconduct with regard to the removal from Panama on which dismissal could have hinged in the absence of illegality, nor do we see a basis for such a finding in the record. We therefore affirm the district court's refusal to dismiss on preservation of judicial integrity or deterrence of illegal government conduct grounds.

## C.   Remedy for *Brady*/*Giglio* Violations

Finally, we turn to Struckman's contention that the exclusion of (1) all evidence attributed to "Ted," (2) Dave Bowden as a witness at trial, (3) evidence taken from Struckman's car by Bowden and not disclosed at the time of the district court's order, and (4) evidence "derived from" the suppressed evidence was insufficient to cure the government's *Brady*/*Giglio* violations. We affirm the denial of dismissal as a remedy.

**[16]** "[R]emedies should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests." *United States v. Morrison*, 449 U.S. 361, 364 (1981). "Because it is a drastic step, dismissing an indictment is a disfavored remedy." *United States v. Rogers*, 751 F.2d 1074, 1076-77 (9th Cir. 1985) (citing *United States v. Blue*, 384 U.S. 251, 255 (1966)). Nonetheless, our circuit has recognized that dismissal with prejudice may be an appropriate remedy for a *Brady* or *Giglio* violation using a court's supervisory powers where prejudice to the defendant results and the prosecutorial misconduct is flagrant. *See United States v. Williams*, 547 F.3d 1187, 1202 (9th Cir. 2008); *Chapman*, 524 F.3d at 1077, 1086. We review for an abuse of discretion the district court's decision whether to dismiss the indictment to cure prejudice resulting from such misconduct. *See Chapman*, 524 F.3d at 1084.

**[17]** "The pivotal question under *Brady* and *Giglio* is whether the evidence withheld from the jury is material," *Libberton v. Ryan*, 583 F.3d 1147, 1163 (9th Cir. 2009), i.e., whether there is a " 'reasonable probability of a different result,' " *id.* (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)) (internal quotation omitted). Struckman did not order a trial transcript. It is, therefore, impossible for us to review the efficacy of the district court's suppression order to cure any *trial* prejudice to Struckman. *See Syncom Capital Corp. v. Wade*, 924 F.2d 167, 169 (9th Cir. 1991) (dismissing an appeal for failure to provide a trial transcript because the petitioner's "main contentions . . . depend[ed] for their resolution on an examination of the facts elicited at trial").

**[18]** Struckman concedes as much, stating in his brief that the "principal problem" was the use of "illicitly-procured and falsely-attributed information . . . to obtain [his] indictment or personal jurisdiction . . . *rather than for evidence at trial*." (Emphasis added.) But the "animating purpose of *Brady* is to preserve the fairness of criminal trials." *Morris v. Ylst*, 447 F.3d 735, 742 (9th Cir. 2006). Thus, a prosecutor's duty is "to

disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial." *United States v. Bagley*, 473 U.S. 667, 675 (1985). Struckman's contentions with respect to his indictment and personal jurisdiction are, therefore, not properly characterized as *Brady* or *Giglio* violations.[11] We discussed above why Struckman's challenge to personal jurisdiction does not require or permit dismissal. Moreover, even assuming the indictment process was deficient for its reliance on unlawfully obtained evidence, that deficiency was cured when Struckman was convicted by a jury after trial that excluded all of the suppressed evidence. *See United States v. Mechanik,* 475 U.S. 66, 70 (1986); *United States v. Navarro*, No. 08-50365, 2010 WL 2331461, *8 (9th Cir. June 11, 2010); *United States v. Du Bo*, 186 F.3d 1177, 1180 n.1 (9th Cir. 1999); *People of the Territory of Guam v. Muna*, 999 F.2d 397, 399 (9th Cir. 1993).

## III.

**[19]** We stress that our affirmance of the district court's careful rulings and remedy in this disturbing case in no way condones the actions of Chinn, Hardaway, or O'Brien or the prosecutors' failure to discover and disclose the misconduct and misrepresentations of the government agents in this case, even absent affirmative prosecutorial misconduct. We are also deeply troubled by defense counsel's assertions at oral argument, not countered by government counsel then or since, that even by the time of Struckman's sentencing, the executive branch had not investigated any of the misconduct documented by the district court. But, as described above and in detail in the district court's careful order, the authority directly to sanction this behavior does not lie with the courts; we can only assure that the misconduct does not give the gov-

---

[11]Struckman also claims that interference with his "privacy rights" led to the court's personal jurisdiction over him and the indictment, and therefore requires dismissal. He provides no support, with appropriate citation to the record, for this contention, so we do not consider it here.

ernment an advantage in obtaining a conviction. The district court's extremely broad, pre-trial suppression order was sufficient to provide this assurance here.

For the foregoing reasons, we **AFFIRM**.

BERZON, Circuit Judge, concurring:

Given the breadth of the district court's suppression order, the discretion accorded a district court in devising remedies for governmental misconduct, and the positions the defendant has taken before us, the main opinion's result—affirming Struckman's conviction—is correct. The defendant makes no attempt to identify anywhere in the record any *possible* cognizable prejudice to him from the government's defiance of the court's discovery order that has not been cured by the suppression order: Struckman disavowed in his brief any trial prejudice and provided no trial transcript on which we could judge such prejudice, complaining in his brief only that the suppressed evidence may have contributed to the indictment. Any such error is harmless at this juncture. *See United States v. Mechanik*, 475 U.S. 66, 70 (1986); *United States v. Navarro*, No. 08-50365, 2010 WL 2331461, *8 (9th Cir. June 11, 2010); *People of the Territory of Guam v. Muna*, 999 F.2d 397, 399 (9th Cir. 1993); *see also United States v. Du Bo*, 186 F.3d 1177, 1180 n.1 (9th Cir. 1999). The district court in the order requiring suppression also required that the government "make a proffer before introducing any evidence at trial to establish that the proposed evidence is *not derived from* the suppressed evidence," (emphasis added), thereby incorporating a restriction on the use of fruits of "Ted"-derived evidence as well. Moreover, the government did make a lengthy such proffer, Struckman objected to it in detail, and the district court ruled in the government's favor after a hearing just before trial.

So where are we left? With no showing in the record of prejudice to the defendant *and* continuing defiance by the government of an order of the district court to produce "Ted"'s identity, after the government prosecutors, knowingly or not, repeatedly provided false information to the court and then defied requests to provide sworn-to information about "Ted"'s identity. We *still* don't know who or what "Ted" is. Struckman's posit was and is that an illegal wiretap must have been involved, and the evidence from Struckman's daughter and former wife registers a similar concern. As far as I can tell, the government has not specifically denied any such activity. Nor has the government in this appeal contested the district court's finding that "Ted"'s full identity remains unknown. So the district court's finding that the government has *still* not told the whole story stands. Given that, and given the history in this case of government disavowals of previous assurances regarding the sources of information, the truth of the matter is left up in the air, whether that truth is that there was an illegal wiretap or that there were one or more other informants. And all of this occurred after the district court, relying on *Roviaro v. United States*, 353 U.S. 53, 59-62 (1957), concluded that Struckman had made a minimal threshold showing that the identity of "Ted" could be relevant to Struckman's defense of governmental misconduct which, if proven, could have led to dismissal at that juncture. That finding of the degree of *potential* prejudice necessary to require revelation of the sources of information has not been contested by the government on this appeal either.

To me, this is an intolerable situation, severely challenging the integrity of the courts and the appearance of justice, and so requires further inquiry on remand before we may lay this case to rest. The district court tailored its remedy for the government's behavior based on the constitutional violation under *Brady v. Maryland*, 373 U.S. 83, 87 (1963), that could otherwise have resulted at trial, treating this case as a traditional *Brady* claim in which the information withheld by the government is actually discovered. But the separate govern-

mental misconduct that occurred in court and has continued to occur—the government's *continuing* defiance of the trial court's discovery orders—has never been remedied, either by insistence on pain of contempt that the government reveal its additional sources after it was determined that it had not done so or otherwise.

I would, therefore, remand for the district court to order the government to reveal the full source of the information attributed to "Ted," in light of the district court's now-final finding that Moritz was not the sole source.[1] Only when this information is available can the district court, and we, accurately determine whether a further remedy, in addition to the suppression order, is appropriate. Should the government refuse to disclose the true source of information attributed to "Ted" on remand, I would instruct the district court to consider separately the appropriate remedy for the ongoing affront to the judiciary. I explain briefly below why I would proceed in this way.

## A.

Here, in review, are the facts pertinent to my concern: Struckman sought to identify "Ted" before trial, arguing "that unless [Ted] is in a very close relationship with defendant, the government would not have been able to obtain such information but for the use of illegal wiretaps." The government opposed revealing "Ted"'s identity and assured the district court that "Ted" would not testify at trial. Despite the govern-

---

[1] As Judge Takasugi has since passed away, I understand that this case would need to be remanded to a new district court judge. Also, as the defendant is unlikely to wish to carry on once his conviction is affirmed, it would probably be necessary to appoint a special counsel for purposes of pursuing the remand proceedings I suggest. (If criminal contempt is pursued, a prosecutor, either for the government or appointed specially by the court, would be mandatory as to conduct occurring outside the court's presence. *See* Fed. R. Crim. Proc. 42(a); *see also Aradia Women's Health Ctr. v. Operation Rescue*, 929 F.2d 530, 532 (9th Cir. 1991).)

ment's stipulation, and relying on *Roviaro v. United States*, 353 U.S. at 59-61, the district court concluded that Struckman had made a minimal threshold showing that the identity of "Ted" could be relevant to Struckman's argument that governmental misconduct required dismissal.

*Roviaro* is the seminal case in which the Supreme Court held that "[w]here the disclosure of an informer's identity, or the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the [government's] privilege [to withhold the informer's identity] must give way." *Id.* at 60-61. Moreover, if the government does not comply with a disclosure order, "the trial court . . . *may* dismiss the action." *Id.* at 61 (emphasis added). *Roviaro* was not decided "on the basis of constitutional claims," but subsequent Supreme Court and Ninth Circuit case law makes clear that due process concerns undergird the *Roviaro* requirement. *United States v. Valenzuela-Bernal*, 458 U.S. 858, 870 (1982) (citing *McCray v. Illinois*, 386 U.S. 300 (1967)); *see also United States v. Gonzalo Beltran*, 915 F.2d 487, 488-89 (9th Cir. 1990). *Roviaro* does not establish any "absolute rule requiring disclosure of an informer's identity," *McCray*, 386 U.S. at 311, and does require a showing of materiality of the identity information, although, as the district court here noted, a relatively minimal one, given the fact that the defendant does not know the identity of the informant. *See Valenzuela-Bernal*, 458 U.S. at 871.

As noted, the district court here found that there was an adequate materiality showing to require *in camera* identification of the source for the information attributed to "Ted," and the government has not challenged that conclusion on appeal. To assess *Roviaro* claims, a trial court must "balanc[e] the public interest in protecting the flow of information against the individual's right to prepare his defense." *Roviaro*, 353 U.S. at 62. The district court attempted to engage in *Roviaro* balancing by ordering the government to produce "Ted" for an *in camera* hearing. But no useful hearing with the man

identified as "Ted" ever came to pass. The district court ultimately found that IRS agents lied about Gary Moritz being the sole source of the information attributed to "Ted," and affirmatively found that the court could not engage usefully in *Roviaro* balancing as a result. We are, then, obliged to go forward on the premises that (1) some of the information attributed to the identified informant had a different, still unknown source, whether a different, unknown individual or, as Struckman suggests, a wiretap; (2) the IRS agents, at least, lied about the source of some of the information attributed to "Ted"; and (3) although it has not been determined whether the prosecutors were complicit in the misrepresentations regarding "Ted," they failed twice to submit statements under penalty of perjury from the government agents although repeatedly directed by the court to do so, providing some indication that they were at least troubled about whether those agents were telling the truth.

Indubitably, this misbehavior of the government agents and perhaps of the prosecutors affirmatively prevented the district court from carrying out the required *Roviaro* balancing. For, unlike in cases such as *Roviaro* and *Valenzuela-Bernal*[2]—the need for the continuing use of the same informants in *Roviaro*, the strong interest in deporting illegal immigrants in *Valenzuela-Bernal*—the government has proffered *no* competing governmental interest in this case at all in justification of its refusal to comply with the discovery order.

The district court so recognized, and held "that by suppressing the source of the information attributed to AI-1/Ted, information that would be material to a defense of governmental misconduct, the government ha[d] committed a *Brady* violation that would result in a due process violation at trial."[3]

---

[2]In *Valenzuela-Bernal*, the Supreme Court relied on *Brady* to hold that deportation of witnesses violates a defendant's due process rights when "the evidence lost [by their deportation] would be both material and favorable to the defense." 458 U.S. at 873; *see also id.* at 867-68.

[3]I view *Roviaro*, albeit decided earlier, as prescribing essentially a subrule under *Brady* for informant situations, with the caveat that where the

Yet, without additional discussion, the district court determined that "the taint of the violation c[ould] be neutralized by excluding any evidence attributed to AI-1/Ted at trial" unless the government "show[ed] an independent source for the information" and also by requiring the government to make "a proffer before introducing any evidence at trial to establish that the proposed evidence [was] not derived from the suppressed evidence." Although *Roviaro*, as noted, authorizes dismissal in similar circumstances, the district court declined to dismiss the indictment, viewing the broad suppression order as adequate for the due process violation. But there was no separate, explicit discussion in the district court's order of the continued refusal to reveal the full identity of "Ted" or of whether additional sanction was merited under the court's supervisory powers—as opposed to under the due process clause—on account of that continued refusal.[4]

## B.

I have been able to find no case similar to this one, in which a broad, pretrial suppression order adequately remedied any due process violation to the defendant,[5] but the governmental defiance of a court order remained entirely unreme-

---

defendant knows there has been an informant but has not had access to the identity of the informant or information provided by him, the prejudice standard operates somewhat more flexibly.

[4]Struckman argued in the district court and argues here that the discovery violations justified dismissal under the court's supervisory powers.

[5]The suppression order would not technically have remedied any due process violation arising if a trial witness who was the source of the information attributed to "Ted" testified about something *not* attributed to "Ted." In that instance, it is possible that the true circumstances underlying the "Ted" information could have yielded cross-examination material —for example, if illegal acts were performed to obtain that information, or if the informant had a secret deal with the government covering both the "Ted" information and the information testified to. But without the trial transcript, we can't tell whether this scenario is even hypothetically possible.

died. I am uncomfortable leaving this affront to the court's integrity and to the appearance of justice unaddressed.

We have recognized that investigatory misconduct *can* be the basis of a dismissal under our supervisory powers. For example, in *United States v. Blanco*, this Court held that the government had not discharged its *Brady/Giglio* obligations when the Drug Enforcement Administration refused to disclose the specifics of a deal with an informant, even to the Assistant U.S. Attorney prosecuting the case, until after the informant had testified at trial. 392 F.3d 382, 392-94 (9th Cir. 2004). We remanded to the district court with instructions to order the disclosure of all *Brady/Giglio* materials and to conduct additional hearings as appropriate. *Id.* at 394. We noted that upon remand, "[a] range of options w[ould] be available to the court, including, at one extreme, dismissal of the indictment for governmental misconduct." *Id.* at 395. Thus, *Blanco* clearly contemplates that a government agency's refusal to comply with discovery obligations as ordered by a district court might warrant dismissal, even when the prosecutor is kept in the dark.

Moreover, even if we focus only on the prosecutors' actions in this case, "unintentional misconduct may be sufficient" to warrant dismissal of an indictment for "flagrant cases of prosecutorial misconduct." *See United States v. De Rosa*, 783 F.2d 1401, 1406 (9th Cir. 1986). Here, the prosecutors at a minimum failed to come forward with declarations under penalty of perjury when asked; even if one supposes that it was the agents who refused to provide the sworn statements, that refusal should have put the prosecutors on notice that there was a problem and led to a report to the court, rather than repeated recalcitrance in the face of a court order. So even if we generously describe the prosecutors' actions as "unintentional," dismissal might still have been an appropriate remedy *if* there was prejudice to Struckman.

But, for obvious reasons—primarily, avoiding a windfall to the defendant as well as the affront to the public interests

underlying the criminal law—our case law requires that even under our supervisory powers, we may dismiss a case as a sanction for governmental misconduct only if a defendant can show prejudice to himself as a result of the misconduct. *See United States v. Chapman*, 524 F.3d 1073, 1077, 1087 (9th Cir. 2008); *United States v. Barrera-Moreno*, 951 F.2d 1089, 1093 (9th Cir. 1991). As I have said, on appeal Struckman makes no attempt to demonstrate that he suffered cognizable prejudice after the district court's order.

So the question remains what remedy will be available on remand after a demand is made for the concealed information?[6] Should the government come forward with information regarding illegal activity underlying the information attributed to "Ted," there might be sanctions attached to that activity. Also, Struckman or anyone else affected might have legal recourse with regard to any concealed illegal activity, once it is exposed.

Should the government continue to refuse on remand to come forward with the full source of the information attributed to "Ted," I would think that personal sanctions against the offending government agents and, if appropriate, the prosecutors would be available, including a criminal contempt inquiry for "[d]isobedience . . . to [the court's] lawful . . . order." 18 U.S.C. § 401; *see also United States v. Galin*, 222 F.3d 1123, 1127-28 (9th Cir. 2000). Further, a judicial referral to both the Department of Justice and the Department of the Treasury for discipline of the individuals involved would also be appropriate. And there may be other alternatives, such as barring the individuals involved from appearance in the district court as witnesses or prosecutors in other cases.

---

[6]On remand, the district court may of course provide that the government first divulge such information *in camera* to protect the identities of any real informants from whom information attributed to "Ted" was obtained.

I do not think it our role at this point to determine the precise remedies available, as we do not know what further inquiry will show. But I do think that, even after affirming the conviction, we should not leave matters as they are with regard to the continuing defiance—continued in this court as well—of the valid order that the informant's identity be revealed.

I therefore concur in the opinion, except that I would remand for the purpose stated.