[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 13-10456
Non-Argument Calendar

_____

D.C. Docket No. 1:11-cr-00359-JRH-WLB-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JAMIE CEJA,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Georgia

_____

(November 4, 2013)

Before CARNES, Chief Judge, TJOFLAT and DUBINA, Circuit Judges.

PER CURIAM:

Jamie Ceja appeals his convictions for (1) conspiracy to distribute and possess with intent to distribute 5 kilograms or more of cocaine and less than 100 kilograms of marijuana, in violation of 21 U.S.C. § 846, and (2) possession with intent to distribute 5 kilograms or more of cocaine, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.  He challenges the district court's:  (1) refusal to dismiss the indictment for lack of personal jurisdiction, (2) denial of his motion to compel discovery, (3) admission of evidence regarding his prior conviction for marijuana trafficking, (4) denial of his motion to acquit on the conspiracy charge, and (5) instruction to the jury on flight as evidence of guilt.

I.

The defendant in this case was born "Sergio Vasquez Torres" in Baja California, Mexico.  He has served prison time in the United States under four other names:  Sergio Toledo Velasquez, Sergio Velasquez-Toledo, John Belmarez, and Jamie Ceja.  When officers arrested him in North Augusta in August 2011, he identified himself as "Jamie Ceja."  For purposes of this appeal, so will we.

Ceja was arrested outside an apartment complex in North Augusta after officers observed him and another suspect sell cocaine to Jerome Greene, a cooperating witness. The arresting officers were part of a joint investigation, made up of DEA agents and law enforcement from Georgia and South Carolina, that had been monitoring Ceja for several months.  The investigation included both Georgia

2

and South Carolina law enforcement because Ceja's operation straddled the border of those two states, working in Augusta, Georgia, as well as North Augusta, which is in South Carolina. The investigators initially took Ceja to the North Augusta Department of Public Safety office. Detective Phillip Turner of that department ran a criminal history search on Ceja while he was being booked. The resulting report accurately reflected Ceja's criminal history under the alias "Jamie Ceja," including a 2007 conviction in Cobb County, Georgia, for trafficking marijuana. Detective Turner did not share that report with Investigator Joel Danko, a member of both the Richmond County Sheriff's Office and the DEA task force in Augusta, Georgia.

Both Turner and Danko interviewed Ceja in North Augusta. He admitted that he had supplied the cocaine used in the sale to the cooperating witness, that he had ties to the infamous Mexican drug cartel "La Familia," and that he had received hundreds of pounds of marijuana from the cartel in the past. Ceja agreed to help the investigators locate drugs in the area and to cooperate with authorities investigating La Familia. That day he led the investigators to two storage units across the state line in Richmond County that held approximately 4.5 kilograms of cocaine and 288 grams of methamphetamine. Because Ceja had been so cooperative, the investigators decided to release him and allow him to return the next week to begin cooperating with the investigation of the cartel.

3

That was a mistake. Ceja promptly fled to Tijuana, Mexico, and called the investigators to tell them he was no longer willing to cooperate. Soon after the State of Georgia issued a warrant for his arrest. The Georgia authorities asked for assistance from one of the U.S. Marshals in Savannah, who provided them with a criminal history report that was different from the one Detective Turner produced in South Carolina. It was a criminal history report for the real Jamie Ceja, the American citizen whose identity Ceja was using. The real Jamie Ceja had a far more serious criminal history, including convictions for rape and attempted murder. Ceja claims that this report is the one the United States gave to the Mexican government when it sought to have Ceja extradited.

In September 2011 Mexican military intelligence agents arrested Ceja in Tijuana, blindfolded him, pushed him into an SUV, and beat him. They drove him to a location thirty-five to forty minutes away where they interrogated him. During the interrogation they bound his hands and feet, kept him blindfolded, and placed a high-powered rifle to his head. Ceja told them that his real name was Sergio Vasquez Torres, he was a Mexican citizen, and he had bought the papers identifying him as Jamie Ceja so that he could work in the United States. After about thirty hours they released him. According to Ceja the agents told him "the extradition papers were incorrect and had [his] identity under a false name."

4

Two weeks later the agents arrested Ceja again.  They pointed rifles in his face, beat him, and took his wallet, watch, laptop, and three cell phones.  The agents then took him to the office for the National Institution of Mexican Immigration.  Ceja overheard officials there discussing "problems with the papers from the United States" and whether he should be turned over given that he was a Mexican citizen.  Eventually he was taken to the Mexican-American border and turned over to an American immigration officer.  That officer took Ceja to the federal district court in San Diego, California, where he was extradited to Georgia based on the outstanding arrest warrant.

A federal grand jury indicted Ceja shortly after he returned to Georgia.  He was tried in the United States District Court for the Southern District of Georgia, and ultimately convicted on Count One, which charged him with conspiracy to distribute and possess with intent to distribute 5 kilograms or more of cocaine and less than 100 kilograms of marijuana, in violation of 21 U.S.C. § 846,[1] and on Count Two, which charged him with possession with intent to distribute more than 5 kilograms or more of cocaine, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.

---

[1] Count One of the indictment actually charged Ceja with conspiracy "to distribute and possess with intent to distribute i. 5 kilograms or more of cocaine hydrochloride, a Schedule II controlled substance; ii. 50 grams or more of methamphetamine (actual), a Schedule II controlled substance, and iii. an amount of marijuana, a Schedule I controlled substance . . . ."  The jury found, however, that Ceja was guilty of only the first and third subcharges of Count One.  Its verdict found that the conspiracy involved "5 kilograms or more" of cocaine and "less than 100 kilograms" of marijuana, but not any amount of methamphetamine.

II.

Ceja contends that the district court had no personal jurisdiction over him because of the manner in which he was brought to the United States. He bases that contention on his assertions that the United States withheld his true identity from the Mexican authorities and the Mexican military intelligence agents physically abused him. We review the district court's denial of Ceja's motion to dismiss the indictment only for an abuse of discretion. United States v. Davis, 708 F.3d 1216, 1221 (11th Cir. 2013).

Under the Ker-Frisbie doctrine, criminal defendants generally cannot defeat personal jurisdiction by asserting that they were brought under the district court's jurisdiction through illegal means. See United States v. Arbane, 446 F.3d 1223, 1225 (11th Cir. 2006); see also United States v. Darby, 744 F.2d 1508, 1530–31 (11th Cir. 1984) (explaining the doctrine's origins in Ker v. Illinois, 119 U.S. 436, 7 S.Ct. 225 (1886) and Frisbie v. Collins, 342 U.S. 519, 72 S.Ct. 509 (1952)). Ceja argues that his case falls under the two exceptions to the Ker-Frisbie doctrine that other circuits have recognized. See, e.g., United States v. Struckman, 611 F.3d 560, 571 (9th Cir. 2010). While this circuit has implicitly adopted the first exception, see Arbane, 446 F.3d at 1225, we have explicitly withheld adoption of the second, see, e.g., United States v. Noriega, 117 F.3d 1206, 1214 (11th Cir. 1997).

6

The first Ker-Frisbie exception applies where "the transfer of the defendant violated the applicable extradition treaty." Struckman, 611 F.3d at 571 (quotation marks omitted). Because Ceja's transfer did not violate the extadition treaty, the exception cannot apply. The Supreme Court has held that "our treaty with Mexico [does] not expressly forbid abductions to secure a defendant's presence." Arbane, 446 F.3d at 1225 (citing United States v. Alvarez-Machain, 504 U.S. 655, 664, 112 S.Ct. 2188, 2194 (1992)). The treaty thus "does not attempt to establish a rule that would in any way curtail the effect of Ker." Alvarez-Machain, 504 U.S. at 665, 112 S.Ct. at 2194. So as long as Ceja was not extradited pursuant to the treaty, whether his transfer to the United States violated provisions of the treaty is of no consequence under the Ker-Frisbie doctrine. See Arbane, 446 F.3d at 1225.

That is precisely what the district court held. It credited documentation the government provided from the Department of Justice's Office of International Affairs showing that no extradition request for Ceja was made. The court therefore concluded that he was not extradited under the treaty and the Ker-Frisbie doctrine applied. Ceja points to no evidence contradicting the district court's findings. Ceja's transfer to the United States was thus an "extra-treaty seizure" that is permissible under the Ker-Frisbie doctrine. Arbane, 446 F.3d at 1225.[2]

---

[2] In the alternative, Ceja asks us to "revisit" the Supreme Court's holding in Alvarez-Machain, 504 U.S. at 664–65, 112 S.Ct. at 2194. As a court of appeals we have no such authority. See Evans v. Sec'y, Florida Dep't of Corr., 699 F.3d 1249, 1263 (11th Cir. 2012).

7

The second Ker-Frisbie exception, if we recognized it, would apply where "the United States government engaged in 'misconduct of the most shocking and outrageous kind' to obtain [the defendant's] presence." Struckman, 611 F.3d at 571 (citation omitted). We have found this exception "questionable" given the Supreme Court's decision in Gerstein v. Pugh. Darby, 744 F.2d at 1531 (citing Gerstein, 420 U.S. 103, 95 S.Ct. 854 (1975)). We have thus required defendants to allege that they suffered "cruel, inhuman and outrageous treatment" during their transfer before we will even consider recognizing the exception. Id. (quotation marks omitted). Ceja's allegations do not reach that level. We consider only Ceja's claims regarding his second arrest because it was that arrest which led to his transfer to the United States. Cf. United States v. Toscanino, 500 F.2d 267, 275 (2d Cir. 1974) (explaining that the second Ker-Frisbie exception suppresses "the fruits" of the government's misconduct).

Ceja claims that the Mexican agents pointed rifles at his face, hit him, and stole his personal property when they arrested him the second time. Those allegations do not assert the kind of cruelty and inhumane treatment necessary to prompt this Court to consider carving out an exception to the Ker-Frisbie doctrine. See Darby, 744 F.2d at 1530–31 (refusing to recognize an exception to the Ker-Frisbie doctrine where the defendant alleged he was forcefully abducted, transported at gunpoint, and wrestled onto a plane bound for the United States).

8

What's more, Ceja does not point to any evidence that the United States government was involved in his mistreatment during the arrest, which would be necessary for the exception to apply. See Struckman, 611 F.3d at 571.

Ceja argues that this second exception should apply because the United States lied to the Mexican government about his citizenship. Misleading another government about a suspect's identity does not strike us as "cruel, inhuman and outrageous treatment." Darby, 744 F.2d at 1531 (quotation marks omitted). In any event, we need not reach the question. The district court found there was no misrepresentation by the United States that induced the Mexican government to transfer Ceja, and he points to no evidence contradicting that finding.

### III.

Ceja filed a pretrial motion requesting all the documents the government had regarding his removal from Mexico. The government informed the district court that it had produced all the relevant documents in its possession. It also presented the court with a letter from the Office of International Affairs stating that no extradition request for Ceja had been made, which meant that there were no extradition documents to produce. The district court credited the government's representations and denied Ceja's motion to compel further disclosure. Ceja claims that decision was error. He insists that "[t]he government has access to national and international records regarding extradition or rendition" and that those

9

documents could have allowed him to challenge the scope of the government's prosecution under the doctrine of "specialty." See generally United States v. Marquez, 594 F.3d 855, 858–59 (11th Cir. 2010) (explaining the "rule of specialty"). But Ceja produced no evidence showing that the government withheld any relevant documents from him. We therefore cannot say that the district court abused its discretion in denying his motion. See United States v. Hastamorir, 881 F.2d 1551, 1559 (11th Cir. 1989).

## IV.

At trial the government introduced evidence of Ceja's 2007 conviction in Cobb County, Georgia, for marijuana trafficking. It did so to prove his criminal intent in both the conspiracy and possession charges. Ceja raises two challenges to the admission of the evidence. First, he claims that the evidence was improperly admitted under Federal Rule of Evidence 404(b). Second, he asserts that the government did not establish at trial a foundation for admitting the evidence of that conviction. Neither argument has merit.

## A.

On December 12, 2011, Ceja filed a motion requesting that the government file notice of its intent to introduce any evidence under Rule 404(b). That same day Ceja filed another motion requesting disclosure of all documents the government had relating to his true identity and aliases. Sixteen days later the

10

government responded to Ceja's request for Rule 404(b) notice, stating that at the time it did not intend to present any such evidence. The government changed its position on March 5, 2012, filing notice of its intent to introduce Rule 404(b) evidence of Ceja's Cobb County conviction. Ceja's trial began four months later on July 9, 2012. He contends that the district court should have granted his motion to exclude the evidence of his Cobb County conviction — not because the evidence was substantively improper under Rule 404(b), but because the government took so long to file its notice. We review the district court's decision under an abuse of discretion standard. United States v. Perez-Tosta, 36 F.3d 1552, 1560 (11th Cir. 1994).

Because Ceja requested notice under the rule, the government had to "provide reasonable notice" before trial of its intent to introduce evidence of the Cobb County conviction. Fed. R. Evid. 404(b)(2). Courts determine whether the government's notice was reasonable by considering three factors: "(1) When the Government, through timely preparation for trial, could have learned of the availability of the [evidence]; (2) The extent of prejudice to the opponent of the evidence from a lack of time to prepare; and (3) How significant the evidence is to

11

the prosecution's case." Perez-Tosta, 36 F.3d at 1562. Ceja makes an argument under the first factor, but not the second or the third.[3]

Ceja claims that the government's notice was unreasonably late because it knew about his Cobb County conviction in August 2011 when Detective Turner ran a criminal report on Ceja at the North Augusta Department of Public Safety. The district court found, however, that the government was not aware of Ceja's Cobb County conviction until after Ceja filed his pretrial motion on December 12, 2011, seeking disclosure of information about his identity and aliases. At trial Investigator Danko explained that Detective Phillips had not shared the August 2011 criminal report with him until February 2012, and that the investigators in Georgia (relying on Ceja's representation that his name was Jamie Ceja) had not been aware that they had the wrong criminal report for Ceja until he filed his December 12 motion. Ceja points to no evidence to contradict Danko's testimony. We therefore cannot say that the district court erred by crediting Investigator Danko's testimony, and in finding that the government did not discover the Cobb County conviction until after Ceja's December 12 motion, and in concluding that the government's investigation and notice were reasonable.

---

[3] Ceja does assert, in a single conclusory sentence, that "[t]he government's late revelation of Ceja's actual criminal history, and its use of that history to locate the criminal conviction introduced at trial did work a prejudice against Ceja." But a bald assertion is not a valid argument. See United States v. Sarras, 575 F.3d 1191, 1216 n.35 (11th Cir. 2009) (rejecting a defendant's argument where he "offers no facts to support [his] bare allegation, other than the blanket assertion").

Even if we were to fully credit Ceja's argument under the first factor, it would not be enough to establish an abuse of discretion under the three-factor test laid out in Perez-Tosta. At most Ceja shows that the government was negligent under the first factor, not that it had an improper motive for delay. See Perez-Tosta, 36 F.3d at 1561. That showing under the first factor is outweighed by the second and third factors, which both favor the government. The purpose of 404(b)'s notice requirement is "[t]o protect defendants from 'trial by ambush,'" and thus the focus of the Perez-Tosta factors is "the prejudice suffered by the defendant because of the lack of notice." Id. Ceja makes no prejudice showing here. That is, he never identifies any preparations that his defense counsel could not make because of the timing of the government's notice, and it is hard to imagine how he could make such a showing. Ceja received the government's notice more than four months before his trial. See id. at 1562 (finding no prejudice where the defendant received six days notice); United States v. Valenti, 60 F.3d 941, 945 (2d Cir. 1995) (finding no prejudice where the defendant received four days notice and did not seek a continuance). Given the clear lack of prejudice, and the district court's uncontested finding that the Cobb County conviction evidence was significant to the government's case, the Perez-Tosta factors ultimately weigh in favor of finding that the government's pretrial notice was reasonable. See Perez-Tosta, 36 F.3d at 1562–63. The district court did not abuse its discretion.

13

B.

Ceja also claims that the government did not lay a proper foundation at trial for admitting a certified copy of his Cobb County conviction. The district court admitted the certified copy over defense counsel's objection. It did so based on Investigator Danko's testimony that he had confirmed, through photographs on the Georgia Department of Corrections website, that the individual convicted of marijuana trafficking in Cobb County was the same Jamie Ceja on trial. Ceja did not object to that testimony at trial and points to nothing suggesting that he was not convicted of marijuana trafficking in Cobb County in 2007. In fact, the affidavit that Ceja submitted in support of his motion to dismiss the indictment attested that he had been convicted in Cobb County. The court's decision to credit Investigator Danko's testimony was not clearly erroneous, and its decision to admit the evidence was not an abuse of discretion. See United States v. Siddiqui, 235 F.3d 1318, 1322 (11th Cir. 2000) (requiring affirmance of a district court's decision to admit evidence absent "a showing that there is no competent evidence in the record to support it").

V.

The first count of the indictment charged Ceja with conspiracy in violation of 21 U.S.C. § 846. It alleged that, from about April 2010 until October 2011, Ceja knowingly and intentionally conspired with others to distribute and possess

14

with intent to distribute 5 kilograms or more of cocaine and an amount of marijuana.[4] Ceja claims that the district court erred in denying his motion for a directed verdict on that count. He argues there was insufficient evidence to prove that (1) he conspired with Jerome Greene or others, and (2) the conspiracy involved the amounts of drugs alleged in the indictment. "We review de novo the sufficiency of the evidence presented at trial, and we will not disturb a guilty verdict unless, given the evidence in the record, no trier of fact could have found guilt beyond a reasonable doubt." United States v. White, 663 F.3d 1207, 1213 (11th Cir. 2011) (quotation marks omitted).

To prove conspiracy the government had to establish at trial, through either direct or circumstantial evidence, that (1) there was an agreement between Ceja and at least one other person, and (2) the object of that agreement was to distribute and possess with intent to distribute cocaine and marijuana. See United States v. Baker, 432 F.3d 1189, 1232 (11th Cir. 2005); United States v. Grant, 256 F.3d 1146, 1152 (11th Cir. 2001). Our review of the record confirms there was sufficient evidence to establish both. Jerome Greene testified that Ceja regularly "fronted" him drugs, giving them to Greene with no upfront payment so that Greene could sell them and then pay Ceja back with part of his earnings. Greene

---

[4] Count One also alleged that the conspiracy involved 50 grams or more of methamphetamine, but we need not discuss that aspect of Count One because the jury found that the conspiracy did not involve methamphetamine.

told the jurors that Ceja gave him: eighteen-ounce quantities of cocaine four times, four ounces of cocaine once, and ten-pound quantities of marijuana two or three times. He also testified that Ceja always gave him the drugs "on the front," and that Ceja did so knowing Greene would be selling them. Investigator Danko bolstered Greene's testimony. He testified that, during Ceja's interview with the investigators, Ceja admitted to knowing Greene before August 2011 and to working for the La Familia cartel distributing drugs in Augusta. Both Greene and Investigator Danko testified that, after Greene was arrested in June 2013, he took the investigators to a storage locker holding more than five pounds of marijuana. Greene's testimony also confirmed that Ceja was the source of that marijuana.

That evidence was sufficient for a reasonable factfinder to conclude beyond a reasonable doubt that Ceja and Greene had an agreement to distribute and possess with intent to distribute cocaine and marijuana. Ceja argues that the evidence showed only a buyer-seller relationship between him and Greene, which is not enough to establish conspiracy. See United States v. Beasley, 2 F.3d 1551, 1560 (11th Cir. 1993). But the evidence allowed the jury to reasonably infer a closer and deeper relationship. The jurors could infer that there was a conspiracy based on the evidence that Ceja and Greene had an ongoing relationship in which Ceja repeatedly transferred cocaine and marijuana to Greene. See United States v. Mercer, 165 F.3d 1331, 1335 (11th Cir. 1999) (allowing jurors to infer a

16

conspiracy from "a continuing relationship that result[ed] in the repeated transfer of illegal drugs to the purchaser"). The jurors also could have inferred there was a conspiracy based on the evidence that Ceja supplied Greene — at no upfront cost — with such large quantities of drugs. See United States v. Brazel, 102 F.3d 1120, 1136 (11th Cir. 1997). For these reasons, there was sufficient evidence for the jury to find a conspiracy as charged in Count One.

There was also sufficient evidence for the jury to find that the conspiracy involved the drug quantities charged in Count One. The testimony of Investigator Danko and cooperating co-conspirator Greene showed that more than 5 kilograms of cocaine was involved in the conspiracy.[5] Their testimony also showed that there was five pounds of marijuana in Greene's storage locker, which was enough to establish that averment of Count One. A reasonable factfinder could have concluded beyond a reasonable doubt, as the jury did, that the conspiracy involved more than 5 kilograms of cocaine and less than 100 kilograms marijuana.

## VI.

The district court instructed the jurors, over Ceja's objection, that they could consider his flight to Mexico as evidence of his guilt. The court told the jury that:

> You are instructed that the flight of the defendant is a circumstance which may be taken into consideration with all other facts and

---

[5] There are 35.274 ounces in a kilogram, and Greene testified that Ceja fronted him at least 76 ounces of cocaine. So Greene's testimony established another 2.15 kilograms on top of the 4.5 that Investigator Danko's testimony established.

circumstances in the evidence. And if you believe and find from the evidence beyond reasonable doubt that the defendant fled for the purpose of avoiding arrest and trial under the charges set out in the indictment, you may take this fact into consideration in determining guilt or innocence.

Ceja claims that this instruction was both "highly prejudicial" and "incomplete." We review the court's flight instruction only for an abuse of discretion. United States v. Cunningham, 194 F.3d 1186, 1199 (11th Cir. 1999).

Ceja first argues that the flight instruction was "highly prejudicial" because it was not fair to infer that he fled because of the drug charges. He points out that he had not been charged with any drug crimes when he fled, and that his status as an illegal immigrant gave him an "alternative motive" to return to Mexico. That may be so, but an alternative explanation for a defendant's flight does not mean a flight instruction is improper. See, e.g., United States v. Williams, 541 F.3d 1087, 1089 (11th Cir. 2008) (concluding that a flight instruction was proper even though the defendant's flight from police could have been due to his fear of arrest on outstanding warrants for other crimes).

A flight instruction is proper so long as (1) the jury is instructed to consider the evidence of the defendant's flight only if it finds, beyond a reasonable doubt, that the defendant fled to avoid the charged crime; and (2) there is evidence from which a reasonable jury could find that he did. Id. The jury instruction in this case clearly included the proper limitation, and the evidence at trial was sufficient to

18

support it.  Investigator Danko testified that Richmond County police first made contact with Ceja in September 2010 when Ceja confronted an investigator about why that investigator was following him.  Danko also testified that Ceja did not flee to Mexico until August 2011, several days after he:  was caught selling cocaine to a cooperating witness, told investigators that he was a La Familia lieutenant, and showed those investigators that he was in possession of 4.5 kilograms of cocaine and more than 200 grams of methamphetamine.  That evidence was enough to prove that Ceja fled to avoid the impending drug trafficking charges.

Ceja also argues that the jury instruction was "incomplete" because it did not direct the jury to follow the four-step inferential chain outlined in United States v. Myers, 550 F.2d 1036, 1049 (5th Cir. 1977).[6]  We have never held that jurors must be instructed to follow Myers' four-step chain.  In fact, we have already affirmed the use of the exact instruction that the district court gave here.  See Bundy v. Dugger, 850 F.2d 1402, 1422 (11th Cir. 1988).

We therefore conclude that the district court did not abuse its discretion in giving the flight instruction.

---

[6] In Myers our predecessor court explained that "flight is an admission by conduct," that provides "circumstantial evidence of guilt."  550 F.2d at 1049.  Jurors considering such evidence infer "(1) from the defendant's behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged."  Id.

**AFFIRMED.**