**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Margarita ACOSTA DE EVANS,**
**Defendant-Appellant.**

**No. 75–2381.**

United States Court of Appeals,
Ninth Circuit.

Feb. 12, 1976.

Kevin J. McInerney, San Diego, Cal., for defendant-appellant.

Terry J. Knoepp, U. S. Atty., San Diego, Cal., for plaintiff-appellee; Howard A. Allen, Asst. U. S. Atty., on the brief.

## OPINION

Before KOELSCH and CHOY, Circuit Judges, and ANDERSON,* District Judge.

CHOY, Circuit Judge:

Margarita Acosta de Evans appeals from her conviction of having harbored an unauthorized alien, a violation of 8 U.S.C. § 1324(a)(3). We affirm.

---

\* The Honorable J. Blaine Anderson, United States District Judge for the District of Idaho, sitting by designation.

1. § 1324. Bringing in and harboring certain aliens; persons liable; authority to arrest
   (a) Any person . . . who—

   . . . . .

   (3) willfully or knowingly conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, in any place, including any building or any means of transportation . . .

   . . . . .

   any alien, including an alien crewman, not duly admitted by an immigration officer or

*Background*

On October 18, 1974, Border Patrol agents went to de Evans' apartment on a tip that unauthorized aliens were present there. They found and arrested four aliens who admitted that they were not legally admitted to the country. These four asserted that they had come to de Evans' apartment by chance and were only there *en passant*. While the agents were questioning these aliens, Imelda Felix-Arroyo returned to the apartment from a shopping trip and was also arrested. Imelda was a relative of de Evans. She had met de Evans previously in Tijuana and had discussed with her the difficulty of getting immigration papers. She entered this country illegally, contacted de Evans, and had been living at the apartment for two months at the time of the arrests. De Evans knew that Imelda was illegally in the country.

At trial, de Evans was found guilty of harboring Imelda in violation of 8 U.S.C. § 1324(a)(3). She was acquitted of counts charging similar violations with regard to the other aliens, as well as a count charging her with conspiring to induce, smuggle and transport aliens in violation of 8 U.S.C. § 1324 and 18 U.S.C. § 371.

*The meaning of "harbor" in § 1324(a)(3)*

De Evans' central contention is that the word "harbor" in § 1324(a)(3)[1] means to harbor so as to prevent detection by law enforcement agents and that, therefore, there was insufficient evidence to convict her. We disagree.

---

not lawfully entitled to enter or reside within the United States under the terms of this chapter or any other law relating to the immigration or expulsion of aliens, shall be *guilty of a felony, and upon conviction thereof shall be punished by a fine not exceeding $2,000 or by imprisonment for a term not exceeding five years, or both, for each alien* in respect to whom any violation of this subsection occurs: *Provided, however,* That for the purposes of this section, employment (including the usual and normal practices incident to employment) shall not be deemed to constitute harboring.

. . . . .

Standard definitions of "harbor" include both concealment and simple sheltering, although the latter appears to be the primary meaning. See Webster's Third International Dictionary of the English Language 1031 (1971). "Harbor" as used in statutes has been construed in each of these ways. Compare *United States v. Grant,* 55 F. 414 (9th Cir. 1893) (harbor does not require secrecy) *rev'd on other grounds,* 58 F. 694 (9th Cir. 1893) with *Susnjar v. United States,* 27 F.2d 223 (6th Cir. 1928) (harbor as clandestine sheltering). "Harbor" in § 1324(a)(3) has been construed each way as well. Compare *Susnjar,* supra, with *United States v. Lopez,* 521 F.2d 437 (2d Cir. 1975).

■ The original version of § 1324, enacted in 1907, prohibited only the smuggling of aliens. It was amended in 1917 to prohibit the concealing or harboring of aliens as well, but no sanctions were prescribed for the added offenses. *In United States v. Evans,* 333 U.S. 483, 68 S.Ct. 634, 92 L.Ed. 823 (1948), the Supreme Court declined to apply the penalties for smuggling to concealing or harboring violations. In 1952 Congress amended the section, adding penalties for concealing, harboring, or shielding from detection. The Second Circuit, in *Lopez,* repudiated its earlier interpretation of harbor as clandestine sheltering, see, e. g., *United States v. Smith,* 112 F.2d 83 (2d Cir. 1940). Only *Susnjar* remains as precedent for de Evans' position. As *Susnjar* was decided before both the Supreme Court's decision in *Evans* and the revision of the statute, its vitality is questionable. The purpose of the section is to keep unauthorized aliens from entering *or remaining* in the country.[2] (Emphasis add-

ed.) We believe that this purpose is best effectuated by construing "harbor" to mean "afford shelter to" and so hold.[3]

■ De Evans argues that the exclusion of employment from the definition of harboring in the statute implies that "harbor" is used in the sense of concealment as part of a smuggling operation,[4] or that if it is not, the exemption of employment is invidious. There may be something unfair about the exemption of employment from harboring—many of the aliens enter this country in search of jobs; the statute allows those who exploit their labor to escape punishment while penalizing persons who, in some instances, may be acting in a neighborly and humane fashion—but it is the kind of unfairness which it is for Congress, not courts, to cure.

The evidence adduced at trial was sufficient to sustain the conviction.

### Jury Instructions

■ De Evans argues that various instructions given to the jury were erroneous and constitute reversible error. Most of the alleged errors rest on the definition of "harbor." Since the definition of "harbor" used by the trial court was correct, the instructions were correct as well. The only other argument is with an "aiding and abetting" instruction. The gist of this argument is that, as the Government had attempted to show that de Evans was the principal in the conspiracy, the giving of an "aiding and abetting" instruction may have confused the jury. De Evans was, of course, acquitted of the conspiracy count. Even if the instruction was improper for the conspiracy count, the instructions as a whole were not

2. Legislative history is set out at 1952 U.S.Code Cong. & Admin.News, p. 1653.

3. This construction also seems more appropriate grammatically. If "conceal," "harbor," and "shield" are all modified by "from detection," we end up with the redundant phrase "conceal from detection" as well as the awkward construction "harbor from detection." The 1917 version of the statute used the phrase "conceal or harbor," so it appears that "shield from detection" is an independent addition. Also, the employment exemption exempts employment from "harboring" and not "harboring or

concealing," indicating that "harbor" has a different meaning from "conceal."

Proposed revisions of the law, *see* Senate Bill No. 1, Jan. 15, 1975, ch. 12 §§ 1212, 1213, and 1311, may change this. However, without speculating on how the revisions would be construed, we note that they are, as yet, only proposals.

4. The harboring need not be part of the chain of transactions in smuggling. The statute is aimed at preventing unauthorized aliens from remaining in the United States as well as preventing them from entering.

confusing as to the harboring count and we do not think that de Evans was prejudiced by them.

Affirmed.