# Church Sanctuary for Illegal Aliens

The historical tradition of providing church sanctuary for criminal offenses was abolished by statute in England in 1623 and thus did not enter the United States as part of the common law.

Providing church sanctuary to illegal aliens probably violates 8 U.S.C. § 1324(a)(3), which forbids the harboring of illegal aliens.

Courts are unlikely to recognize church sanctuary as legally justified under the Free Exercise Clause of the First Amendment, because disagreement with the government's treatment of aliens is not a religious belief that is burdened by enforcement of the immigration laws, and the government has a compelling countervailing interest in uniform law enforcement.

October 31, 1983

MEMORANDUM OPINION FOR THE DEPUTY ATTORNEY GENERAL

We have discussed briefly at various times the legal issues raised by churches offering sanctuary to illegal aliens, recently those from El Salvador.[1] We have undertaken to provide you with a preliminary and very general analysis of those issues. In doing so, we have examined whether there is any law which makes it illegal to provide sanctuary and have concluded that the practice probably violates 8 U.S.C. § 1324(a)(3). We have also examined whether a charge of violating 8 U.S.C. § 1324(a)(3) could be defeated by the defense that sanctuary should be recognized at common law or should be protected by the First Amendment. We do not believe that a court would recognize either of these defenses.

## I. Historical Background

The practice of providing asylum in a church or other sacred place has roots in ancient history,[2] although Christian churches were not recognized by Roman law as places of sanctuary until the 4th century.[3] Ecclesiastical sanctuary spread with the growth of the church but the exact nature of the privilege varied from country to country.[4] The English common law permitted an accused felon

---

[1] See Wash. Post, Oct. 11, 1983, at B1, col. 2; N.Y. Times, Sept. 21, 1983, at A18, col. 1; Time, Apr. 25, 1983, at 118; N.Y. Times, Apr. 8, 1983, at A1, col. 1.

[2] See generally 24 Encyclopedia Americana 218 (1983); 19 Encyclopaedia Britannica 992–93 (1971); 13 Encyclopaedia of the Social Sciences 534 (1935). See also Deuteronomy 4:41, 4:42.

[3] Encyclopaedia Britannica, supra note 2, at 993.

[4] Encyclopedia of the Social Sciences, supra note 2, at 535–36.

to seek sanctuary in a church where he could choose either to submit to trial or to confess and leave the country.[5]

The general demise of government recognition of church sanctuary took many years and is usually seen as the result of the growth of strong central governments and the development of effective national systems of justice.[6] In England, efforts to curtail abuses of church sanctuary or to eradicate sanctuary altogether achieved their first major success during the Reformation when many of the recognized sanctuaries were abolished and replaced by a limited number of cities of refuge.[7] Sanctuary for criminals in England was finally abolished in 1623.[8]

We have found no evidence that the colonists revived church sanctuary in America.[9] A search of both federal and state case law has revealed no case recognizing church sanctuary as a legitimate barrier to law enforcement. It is true that American churches have been used at times as symbolic sanctuaries. During the Vietnam War, for example, some churches offered "sanctuary" to young men who did not want to serve in the Armed Forces. *See Bridges* v. *Davis,* 443 F.2d 970 (9th Cir. 1971), *cert. denied,* 405 U.S. 919 (1972); *United States* v. *Beyer,* 426 F.2d 773 (2d Cir. 1970). In both of the cited cases federal officers eventually entered the churches and arrested individuals.[10] Thus, as with the protection presently being offered by churches to illegal aliens, the continued existence of the "sanctuary" depended entirely upon the authorities' desire to avoid a confrontation.

## II. Legality of Sanctuary

The housing of illegal aliens by churches would appear to be a violation of 8 U.S.C. § 1324(a)(3), which forbids the harboring of illegal aliens.[11] Although the churches alert the INS that they are offering the aliens shelter, the most recent case law rejects the notion that harboring must involve actually hiding the alien or otherwise "clandestine" activity. *United States* v. *Acosta De Evans,* 531 F.2d 428, 430 (9th Cir. 1981). Instead, harboring has been held to include

---

[5] W. Blackstone, 4 *Commentaries on the Laws of England* 332–33 (1765).

[6] T. Plucknett, *A Concise History of the Common Law* 382 (2d ed. 1936); *Encyclopaedia of the Social Sciences, supra* note 2, at 536–37 (1935).

[7] *Encyclopaedia Britannica, supra* note 2, at 993.

[8] An Act for Continuing and Reviving of Divers Statutes, and Repeal of Divers Others, 1623, 21 Jac. 298, 303, ch. 28, § 7. *See also* Blackstone, *supra* note 5, at 333. Sanctuaries from civil process lingered on in some districts until 1723. *Encyclopaedia Britannica, supra* note 2, at 993.

[9] For example, church sanctuary is not referenced in such basic sources as *The Records of the Federal Convention* (M. Farrand ed. 1966), *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* (J. Elliot ed. 1836), *The Federalist Papers* (C. Rossiter ed. 1961), or *The Complete Anti-Federalist* (H. Storing ed. 1981).

[10] That the men had been taken from a church was recited in the facts of both cases but played no part in either court's legal analysis.

[11] Section 1324(a)(3) provides:

Any person . . . who . . . willfully or knowingly conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, in any place, including any building or any means of transportation . . . any alien . . . not duly admitted by an immigration officer . . . shall be guilty of a felony . . . .

169

knowingly taking steps that "afford shelter to" an illegal alien, even if done without the purpose of concealing the alien from the immigration authorities. *Id.* "[T]he term was intended to encompass conduct tending substantially to facilitate an alien's 'remaining in the United States illegally,' provided, of course, the person charged has knowledge of the alien's unlawful status." *United States* v. *Lopez,* 521 F.2d 437, 41 (2d Cir.) (citation omitted), *cert. denied,* 423 U.S. 995 (1975). *See also United States* v. *Cantu,* 557 F.2d 1173, 1180 (5th Cir. 1977), *cert. denied,* 434 U.S. 1063 (1978). The debate on the conduct covered by harboring is not entirely settled, however, as there are older cases that take a contrary position. *See Susnjar* v. *United States,* 27 F.2d 223 (6th Cir. 1928). In addition, all of these cases involved defendants who simply kept silent about the aliens' presence, rather than individuals who have reported the aliens' presence to the INS but who have continued to shelter them.

We believe that it is unlikely that the historical tradition of offering sanctuary would provide a defense to an indictment under 8 U.S.C. § 1324(a)(3). As noted above, church sanctuary for criminal offenses was abolished by statute in England in 1623 and thus did not enter the United States as part of the common law. It has never, as far as we can discover, been recognized here by any state or federal legislation.[12] The only way to use church sanctuary as a successful defense on historical grounds would be to persuade the courts to resurrect the common law right. This is unlikely. Not only have centuries passed since sanctuary was abolished by statute, but there are major policy implications in a decision to revive sanctuary. Sanctuary grew out of the need of primitive societies for a place of respite. Where blood feud and tribal concerns dominate a society or the courts are weak or the executive is too ready to dispense harsh and bloody punishment, there may be a need for sanctuary. None of these conditions exists in this country today. We doubt the courts would be willing, even in the face of sympathetic facts, to hold that they were no longer able to enforce the country's laws in the church sanctuaries.[13]

Nor do we believe that a court would recognize sanctuary as legally justified under the Free Exercise Clause of the First Amendment.[14] Although there are cases recognizing that some government regulations must yield if contrary to the sincere religious convictions of a citizen,[15] we do not believe that the

---

[12] Although a complete search of all state laws enacted since 1789 is impractical, we have reviewed human rights treatises, general and specialized encyclopedias, and historical reference works without uncovering any reference to an American law dealing with church sanctuary. Churches have often opposed particular government policies by preaching civil disobedience, but not, as far as we can determine, by claiming a general exemption from the legal process. There was no claim, for example, that either the Underground Railroad or the sit-ins of the modern Civil Rights movement were legal — only that the particular laws involved were immoral and should, therefore, be changed.

[13] The issue for countries with modern governments, such as the United States, has instead become whether to grant asylum to aliens (in derogation of a sister state's laws), leaving behind the more primitive question of whether to permit derogation of one's own criminal laws by permitting churches to act as sanctuaries — and thus, as alternate sources of temporal power.

[14] N.Y. Times, Apr. 8, 1983, at A16, col. 5 (reporting the view of Thomas Cannon of the Marquette University School of Law that offering sanctuary could be legally justified under the First Amendment and as an observance of an ancient custom with roots in the Judeo-Christian tradition).

[15] *See, e.g., Wisconsin* v. *Yoder,* 406 U.S. 205 (1972); *Sherbert* v. *Verner,* 374 U.S. 398 (1963).

170

analysis in those cases will protect people harboring illegal aliens. First, disagreement with the government's treatment of illegal aliens is not a religious belief that is burdened by enforcement of the immigration laws. Sherbert v. Verner, 374 U.S. 398, 403–06 (1963). Church members are not compelled by our deportation of aliens to forego a religious practice, such as resting on the Sabbath. Even if granting sanctuary were viewed as a legitimate religious practice authorized by modern canon law, which all the evidence suggests it is not, the federal government has a compelling countervailing interest in insuring that the law is enforced throughout our country.[16] The integrity of our government would be seriously threatened if individuals could escape the criminal law by pleading religious necessity.

### III. Suggestions for Statement

It has been suggested that the Department might wish to issue a formal statement on the growing use of churches as places of sanctuary for illegal aliens. If it is decided to do so, we recommend that the statement indicate that there is a statutory right to file for asylum in this country. 8 U.S.C. § 1158. INS does not deport aliens during the pendency of an application. The statement might reiterate our determination to adjudicate all asylum claims fairly, and urge that those with bona fide claims file them promptly.

The plight of illegal aliens in this country obviously generates strong emotions, especially when aliens are seeking escape from a strife-filled nation and argue that the government from which they are seeking sanctuary is the source of at least some of the violence. In any prosecution the courts are likely to be presented with defendants whose cases are sympathetic and whose advocates will be drawn from persons who assert a moral basis for their views. As in the case of enforcing any law affecting large numbers of people who may have acted pursuant to strong and principled convictions, sensitivity in the process, with adequate notice to all involved and manifest concern for matters of conscience, will be an important ingredient in convincing the courts to uphold enforcement.

THEODORE B. OLSON
*Assistant Attorney General*
*Office of Legal Counsel*

---

[16] Unlike the beliefs protected in *Yoder,* which were recognized by the Supreme Court as having been practiced consistently for centuries, church sanctuary has been a nullity for over three hundred years The comments of various church leaders, *see supra* note 1, indicate that while the bishops may sympathize with their pastors' intentions, they also recognize that harboring the aliens is illegal and not immunized by an invocation of church sanctuary.