**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

DAVID JAMES GARRISON,
*Defendant-Appellant.*

No. 15-50137

D.C. No.
2:11-cr-00922-DDP-6

OPINION

Appeal from the United States District Court
for the Central District of California
Dean D. Pregerson, District Judge, Presiding

Submitted March 6, 2018[*]
Pasadena, California

Filed April 25, 2018

Before: Ronald M. Gould and Mary H. Murguia, Circuit
Judges, and Dana L. Christensen,[**] Chief District Judge.

Opinion by Judge Gould

---

[*] The panel unanimously concludes this case is suitable for decision
without oral argument. *See* Fed. R. App. P. 34(a)(2).

[**] The Honorable Dana L. Christensen, Chief United States District
Judge for the District of Montana, sitting by designation.

## SUMMARY[***]

### Criminal Law

The panel affirmed a conviction for conspiracy to distribute controlled substances in violation of 21 U.S.C. § 846, in a case in which the government offered evidence that the defendant and his co-conspirators had abused their positions as healthcare providers by intentionally prescribing OxyContin for no legitimate medical purpose as part of a scheme to sell the drug on the street.

The panel held that the evidence was sufficient to allow a reasonable jury to draw the inference that the defendant was prescribing OxyContin with the intent to do so for no legitimate purpose, and was sufficient to lead a reasonable jury to conclude that the defendant had agreed to further the scheme to illicitly distribute OxyContin.

The panel also held that there is no error in the remedies the trial court crafted for the government's late disclosures or in the jury instructions the court gave regarding the abrupt departure of two co-defendants from the trial and the dismissal of charges against a third co-defendant.

---

[***] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

## COUNSEL

Michael R. Belter (argued), Salinas, California, for Defendant-Appellant.

Angela J. Davis, Assistant United States Attorney, Major Frauds Section; Lawrence S. Middleton, Chief, Criminal Division; United States Attorney's Office, Los Angeles, California; for Plaintiff-Appellee.

## OPINION

GOULD, Circuit Judge:

After a jury trial, David James Garrison was convicted of conspiracy to distribute controlled substances in violation of 21 U.S.C. § 846. During trial, the government offered evidence that Garrison and his co-conspirators had abused their positions as healthcare providers by intentionally prescribing OxyContin, a powerful opioid pain reliever, for no legitimate medical purpose as part of a scheme to sell the drug on the street. Garrison appeals his conviction, arguing (1) that there was insufficient evidence to support his conviction, and (2) that the district court should have dismissed the charges against him, acquitted him, or granted him a mistrial because the government did not timely disclose certain information. We affirm.

## I

There is now an epic crisis of deadly opioid abuse and overuse. In 2016, roughly 11.5 million people in the United States misused prescription opioids. U.S. Dep't of Health and Human Services, *About the U.S. Opioid Epidemic* (2018), https://www.hhs.gov/opioids/about-the-epidemic/

(last visited March 8, 2018).  That same year, 116 people on average died every day from opioid-related drug overdoses. *Id.*  And in 2017, the Acting Secretary of Health and Human Services declared the national opioid abuse epidemic a public health emergency.  U.S. Dep't of Health and Human Services, *HHS Acting Secretary Declares Public Health Emergency to Address National Opioid Crisis* (2017), https://www.hhs.gov/about/news/2017/10/26/hhs-acting-secretary-declares-public-health-emergency-address-national-opioid-crisis.html (last visited March 8, 2018).

In the midst of this crisis, we trust doctors and healthcare professionals to be conscientious gatekeepers to these dangerous and potentially fatal drugs.  But unfortunately some medical professionals betray their duty to do no harm as healthcare providers and abuse their prescription pads. This is exactly what happened at the Lake Medical Group clinic (the "Clinic"), where Garrison worked as a licensed physician's assistant from summer 2009 until the Clinic was closed in February 2010.

The Clinic was what is often described as a "pill mill," and the activities of people working there led to the illicit street-sale of more than a million maximum-strength OxyContin tablets.  From August 2008 to September 2010, the Clinic generated 13,207 prescriptions for OxyContin—all but six of which were for the drug's maximum dosage. The Clinic employed "patient recruiters" who induced people living in homeless shelters and rescue missions to visit the Clinic.  These of course were not true "patients" in the ordinary sense of that word.  The Clinic would then use the names and Medicare or Medi-Cal cards of the recruited patients to generate fraudulent OxyContin prescriptions. The recruited patients did not retain the OxyContin that they

were prescribed. Instead, people working for the Clinic retrieved the drug from participating pharmacists or from the recruited patients, and the Clinic operators then had the pills sold illegally. The government learned of the Clinic's operations and took steps to shut the Clinic down and prosecute those it believed responsible for the scheme.

## A

On September 28, 2011, Garrison and eleven other codefendants were indicted. Garrison was indicted for conspiracy to distribute controlled substances in violation of 21 U.S.C. § 846, based on his alleged role in the conspiracy to distribute OxyContin for no legitimate medical purpose.[1] A second superseding indictment was filed, and the case proceeded to trial. Garrison was tried with four alleged co-conspirators: Elza Budagova, who acted as a medical assistant at the Clinic, and pharmacists Theodore Yoon, Phic Lim, and Perry Tan Nguyen.

An expert testified that there were indications from the Clinic's medical files that the prescriptions from the Clinic were not for a proper medical purpose. Many files had minimal patient histories and in other files the patient histories were virtually identical, indicating that they had been forged. Further, there was expert testimony that immediately prescribing maximum strength OxyContin, as was done at the Clinic, was not a proper medical practice.

At trial, the government offered documentary and testimonial evidence against Garrison. Garrison stipulated

---

[1] Other codefendants were charged with conspiracy to commit health care fraud, 18 U.S.C. § 1349; unlicensed wholesale distribution of prescription drugs, 21 U.S.C. §§ 331(t), 333(b)(1)(D), 353(e)(2)(A); and aiding and abetting, 18 U.S.C. § 2.

that he wrote and signed hundreds of prescriptions for OxyContin with similar diagnoses on the prescription pads of other medical professionals.  Garrison also agreed that it was his handwriting on numerous prescriptions for OxyContin that appeared to have been pre-signed by other persons working at the Clinic.  He also signed and left blank prescription forms in his own name, apparently for the use of others in making prescriptions to the phony patients.

Recruited patients testified at trial that they had never been examined by anyone at the Clinic, yet their medical files reflected that they had been given an OxyContin prescription in Garrison's handwriting, though on other physicians' prescription pads.  There was also video evidence of Garrison prescribing OxyContin to a person posing as a recruited patient after a six minute interaction.  A medical expert testified that there was no medical need for that OxyContin prescription.

Garrison also lied to an investigator about the extent of the physician oversight he received at the Clinic—claiming that almost all of his patient examinations were signed off on by a physician, whereas the investigator found that the vast majority of Garrison's examinations were not cosigned by a licensed physician.

Two cooperating witnesses testified against Garrison: Eleanor Santiago and Julie Shishalovsky.  Santiago, a former licensed physician, had pled guilty to health care fraud after falsifying Medi-Cal claims while she was working at the Clinic.  Santiago testified that the Clinic was a pain management clinic with a focus on people suffering from chronic pain, which meant that many of the patients had already tried to use less intense pain medications.  She testified that Garrison saw patients without her oversight and that Garrison had prescribed OxyContin on a prescription

slip that Santiago had pre-signed.  Santiago also testified that Garrison would sometimes give her medical charts to cosign, and that she had noticed that he had prescribed all his patients OxyContin.  She told Garrison that some of the patients did not need that drug, but he continued prescribing OxyContin for them anyway.

Shishalovsky worked as a receptionist at the Clinic and testified that the Clinic's operators directed that all of the Clinic's patients should be prescribed the highest strength OxyContin, even when there was no need for OxyContin. She also testified that Garrison completed pre-signed prescriptions "very often," and also pre-signed his own prescriptions.

Garrison made extensive efforts to impeach the credibility of both of these witnesses, stressing that they both had criminal records and had engaged in fraudulent conduct in the past.  Garrison did not call any witnesses of his own in his defense.  Garrison's main line of defensive argument was that he was not aware of the conspiracy and that he did not knowingly participate in the conspiracy.

## B

Before and during trial, the government made grave mistakes in its prosecution of the case by repeatedly failing to timely disclose information to the defense, as was required by law.  First, a witness who testified at trial, Bernard Harris, admitted at trial that he had submitted a false medical report to his probation officer and to a judge, and Harris said that Santiago and Shishalovsky helped him fabricate the record. The government questioned Santiago about Harris's statement the morning before she testified, and she admitted that she had helped falsify the medical records.  But the government did not turn over its notes documenting

Santiago's statement to the defense, although it questioned Santiago about assisting in the falsification during her trial testimony.  Santiago testified that she had helped falsify a letter regarding Harris's medical records.  Shishalovsky also admitted during trial to falsifying medical records, and the government stated that Shishalovsky had told them about this months before trial, although, the interview report from that discussion did not contain this pertinent disclosure.

Also, the government delayed turning over to the defense documents relating to Shishalovsky's plea negotiations with the government until a couple of days before Shishalovsky testified.  The government has conceded that it should have turned over this information much sooner pursuant to *Giglio v. United States*, 405 U.S. 150 (1972), which requires the disclosure of promises made to witnesses in exchange for their testimony.  Importantly, the newly-disclosed negotiations informed the defense for the first time that in exchange for testimony, the government agreed that Shishalovsky would be able to continue working in the healthcare field.  The government failed to disclose this agreement, either during Shishalovsky's sentencing or during her direct testimony at trial.  The district judge was also belatedly informed of this agreement, and during a break in Shishalovsky's testimony the court advised the jury of the government's and Shishalovsky's failure to disclose this agreement, and told the jury that it could consider this background in evaluating Shishalovsky's credibility.  The judge also commented to the jury on the irregularity of the agreement.

There were other problems with disclosure.  Matthew Cho was an alleged co-conspirator and a former pharmacist. Cho and two other codefendants, Yoon and Lim, entered into

a joint defense agreement.[2]   Shortly before trial, Cho's counsel emailed a letter to the government and to counsel for Yoon and Lim that appeared to cover information shielded by the joint defense agreement**.**   The government then realized that other letters that it had received from Cho's counsel might also contain information that should have been protected under the joint defense agreement.

The government also learned that Cho had been forwarding confidential information that was potentially covered by the joint defense agreement to his FBI agent brother.  Those emails concerned how Cho might get a deal from prosecutors in exchange for his testimony.  The district court characterized those emails as material that should have been turned over pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), which requires a prosecutor to turn over potentially exonerating evidence to the defense.   The government agreed that it did not timely inform the defense of Cho's discussions with his FBI agent brother.  Cho was not called as a trial witness.

Weeks into trial, the government moved to dismiss its charges against Yoon and Lim.  The government conceded that it had repeatedly failed to timely turn over *Brady* and *Giglio* evidence, and that it accepted Yoon's and Lim's counsel's representation that Cho's counsel had wrongfully disclosed evidence that prejudiced Yoon and Lim.  The district court granted the motion and also dismissed the charges against pharmacist defendant Nguyen that had also

---

[2] A joint defense agreement extends attorney-client privilege to disclosures made between the attorneys for codefendants, between codefendants, and between one codefendant to another codefendant's attorney.  *See United States v. Gonzalez*, 669 F.3d 974, 978 (9th Cir. 2012).

been brought against Yoon and Lim, leaving only the charge against Nguyen for financial structuring of transactions to avoid reporting requirements in violation of 31 U.S.C. § 5324(a)(3).  The district court then gave an instruction telling the jury not to read anything into the fact that Yoon and Lim were no longer part of the case and that counts had been dismissed against Nguyen.

Garrison moved for a dismissal or mistrial arguing that the government's discovery violations prejudiced him and that Yoon's and Lim's sudden absences from the trial inescapably would lead the jury to assume that Garrison was guilty.  Although the government conceded that it had failed to timely produce all of the material to which the defense was entitled, it argued that any prejudice would be cured by jury instructions.  The government also noted that Garrison was not a party to the joint defense agreement.  The district court denied Garrison's motion.

At the close of trial, the district court instructed the jury by advising of the government's failure to timely comply with its constitutional obligations, and telling the jury that it could draw adverse inferences from this failure.  The court also advised the jury that this consideration could lead the jury to find reasonable doubt as to Garrison's and his codefendants' guilt.[3]  The jury was again instructed not to

---

[3] The instruction the district court gave was as follows:

> Under the United States Constitution, in order for the defendant to receive a fair trial, the Government must inform the Defense of any information known to the Government that tends to suggest the defendant might not have committed the crimes or crime charged . . . and any information that casts doubt on the credibility of the Government's own evidence.  In this case, the

speculate as to the reason for Yoon's and Lim's absences from the trial or to draw inferences for or against the remaining defendants based on Yoon's and Lim's absences.[4] Upon being instructed, the jury deliberated and delivered a verdict finding all the remaining defendants guilty.

Garrison again moved for a new trial or for an acquittal, arguing (1) that the government's *Brady* and *Giglio* violations required a new trial; (2) that Yoon's and Lim's dismissal in the midst of the trial and the dismissal of a portion of the charges against Nguyen prejudiced Garrison; and (3) that there was insufficient evidence to convict Garrison. The district court denied this motion, explaining that it considered Garrison to be differently situated from the pharmacist defendants and that it was not uncommon for some defendants to be dismissed from a multi-defendant trial during trial. Additionally, the district court reasoned that there was significant documentary evidence against

_____

Government violated those important Constitutional principles upon which the fair administration of our system of justice depends on multiple occasions. In evaluating the merits of this case, you can decide what weight, if any, to give to the Government's violations of these Constitutional principles. The Government's actions standing alone or in combination with other facts presented in this case, may create a reasonable doubt in your mind about the defendant's guilt.

[4] The instruction the district court gave was as follows:

For reasons that do not concern you, the case[s] against defendants Theordore Yoon and Phic Lim are no longer before you. Do not speculate why. This fact should not influence your verdicts with reference to the remaining defendants. And you must base your verdict solely on the evidence against the remaining defendants.

Garrison separate and apart from any witness testimony. The parties then proceeded to sentencing where Garrison received a 120-month sentence. Garrison appeals.

## II

When faced with a sufficiency of the evidence challenge, we "must consider the evidence presented at trial in the light most favorable to the prosecution" and then must determine whether the evidence is sufficient to allow "any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt." *United States v. Nevils*, 598 F.3d 1158, 1164 (9th Cir. 2010) (internal citations, quotation marks, and alterations omitted) (en banc). *Nevils* applied the well-known standard developed by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307 (1979), which vests in the jury a great deal of leeway in reaching its verdict, and promises that a jury verdict will be sustained when a rational trier of fact, viewing the evidence in the light most favorable to the government, could find all elements of the crime proved beyond a reasonable doubt. *Id.* at 318–19. Our decision on sufficiency of the evidence is made *de novo*. *United States v. Green*, 592 F.3d 1057, 1065 (9th Cir. 2010).

By contrast, we review for abuse of discretion a district court's decision about what sanction to impose for the untimely disclosure of *Brady* and *Giglio* material. *See United States v. Struckman*, 611 F.3d 560, 577 (9th Cir. 2010); *see also United States v. Sterling*, 724 F.3d 482, 512 (4th Cir. 2013).

## III

Garrison was charged with conspiracy to distribute OxyContin in violation of 21 U.S.C. § 846 on the grounds that he had distributed OxyContin outside the course of usual

medical practice and for no legitimate medical purpose in violation of 21 U.S.C. § 841. "To establish a drug conspiracy, the government must prove (1) an agreement to accomplish an illegal objective; and (2) the intent to commit the underlying offense." *United States v. Duenas*, 691 F.3d 1070, 1085 (9th Cir. 2012) (internal citations and quotation marks omitted). Further, to demonstrate the underlying violation of § 841 the government must prove three elements:

> (1) that the practitioner distributed controlled substances, (2) that the distribution of those controlled substances was outside the usual course of professional practice and without a legitimate medical purpose, and (3) that the practitioner acted with intent to distribute the drugs and *with intent to distribute them outside the course of professional practice*.

*United States v. Feingold*, 454 F.3d 1001, 1008 (9th Cir. 2006). Here, Garrison is not challenging that there was a conspiracy to run a pill mill out of the Clinic; rather, he contends that there was inadequate evidence at trial to demonstrate that he was aware of the conspiracy or knowingly participated in the conspiracy.

We do not consider this to be a close case on sufficiency of evidence. As to the underlying violation, there was expert testimony that Garrison acted outside the scope of usual medical practice and that he participated in distributing OxyContin in an alarmingly high volume and strength for no legitimate medical purpose. Further, Garrison pre-signed prescriptions, filled out pre-signed prescriptions, and wrote OxyContin prescriptions for people neither he nor anyone else at the clinic had ever examined. He also lied to an

investigator about his standard practices. Inconsistencies or lying can lead a jury to infer intent. *United States v. Haro-Portillo*, 531 F.2d 962, 963 (9th Cir. 1976). This evidence was sufficient to allow a reasonable jury to draw the inference that Garrison was prescribing OxyContin with the intent to do so for no legitimate medical purpose. *See Feingold*, 454 F.3d at 1007.

Even though there was no direct evidence that Garrison had entered into an agreement to participate in a drug conspiracy, it is well-established that "a jury may infer the existence of an agreement from circumstantial evidence, such as the defendant's conduct." *United States v. Reed*, 575 F.3d 900, 924 (9th Cir. 2009). There is no dispute here that there was a conspiracy to improperly distribute OxyContin. "[O]nce a conspiracy is established only a slight connection to the conspiracy is necessary to support a conviction," meaning "that a defendant need not have known all the conspirators, participated in the conspiracy from its beginning, participated in all its enterprises, or known all its details." *United States v. Herrera-Gonzalez*, 263 F.3d 1092, 1095 (9th Cir. 2001).

Here, Garrison had much more than a slight connection with the conspiracy. He was a major actor in it. He filled out prescriptions for OxyContin that had been pre-signed by other medical professionals—often repeating similar diagnoses to support those prescriptions—and he pre-signed his own prescription pad, apparently so others could draw prescriptions from it. Coordination like this is "strong circumstantial proof of agreement" in a conspiracy case. *Reed*, 575 F.3d at 924 (internal citation and quotations omitted). Garrison need not have been aware of or participated in the full scope of the scheme—so long as he had agreed to further a portion of its illicit operations by

colluding in writing fraudulent prescriptions, he could be convicted. *See Herrera-Gonzalez*, 263 F.3d at 1095. There was sufficient evidence to lead a reasonable jury to conclude that Garrison had agreed to further the scheme run out of the Clinic to illicitly distribute OxyContin.

## IV

Garrison next contends that because charges were dismissed against Yoon, Lim, and Nguyen, charges should also have been dismissed against him. He further contends that because the government repeatedly failed to timely disclose evidence revealing weaknesses in its case, there is "little doubt" that, if that evidence been timely disclosed, Garrison would have been acquitted. Garrison also argues that Yoon's and Lim's sudden absence from the trial prejudiced him and implied his guilt. We disagree on all these points.

District courts have discretion in shaping the remedies for *Brady* and *Giglio* violations. *See Struckman*, 611 F.3d at 577. Remedies for such violations, however, "should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests." *Id.* (quoting *United States v. Morrison*, 449 U.S. 361, 364 (1981)). Because dismissing an indictment is a "drastic step," it is "disfavored." *Id.* (internal citations omitted). But, where a defendant was prejudiced by the late disclosure and there was flagrant prosecutorial misconduct, dismissal with prejudice may be an appropriate remedy. *Id.*

At the outset, none of the issues regarding Cho were relevant to Garrison—Garrison was not a party to the joint defense agreement and Cho did not testify at Garrison's trial. Indeed, during the hearing on Garrison's motion for acquittal

and a new trial, his counsel said that the issues regarding Cho "really had nothing to do with Mr. Garrison." In this way, Yoon and Lim were differently situated from Garrison. Nguyen was also differently situated because, unlike Garrison but like Yoon and Lim, he was a pharmacist, not an insider at the Clinic. It was not inconsistent for the district court to dismiss the charges against Yoon, Lim, and Nguyen, while leaving the charges against Garrison in place.

There is no dispute here that the government failed to comply with the requirements of *Brady* and *Giglio* when it disclosed evidence late regarding Santiago and Shishalovsky falsifying records for Harris, and failed to timely disclose the side deal with Shishalovsky. All of the late disclosed evidence, however, was given to the jury. And the district court gave a jury instruction telling the jury that the government had disclosed evidence late and that the jury could draw adverse inferences from that late disclosure. From the instruction it is clear that the jury was empowered to exonerate Garrison because of the government's misconduct, if it chose to do so. But the jury instead found Garrison guilty. In light of the extensive evidence against Garrison, we cannot conclude that any prejudice stemmed from the late disclosure. *See United States v. Howell*, 231 F.3d 615, 627 (9th Cir. 2000) (finding no prejudice where the defendant was able to effectively cross-examine witnesses about the evidence the prosecutor disclosed only during trial and there was significant other evidence of the defendant's guilt).

Finally, Yoon's and Lim's sudden absences from trial and the dismissal of charges against Nguyen, were not prejudicial to Garrison. In instances where defendants depart from a multi-defendant trial late in the trial, we have stated that "the best course may be simply to tell the jury that

the defendant is no longer part of the case." *United States v. Bussell*, 414 F.3d 1048, 1053 (9th Cir. 2005). This is exactly what was done here. The district court also instructed the jury not to speculate as to the reason for Yoon's and Lim's absences and the dismissal of charges against Nguyen, and specifically highlighted that the absences and the dismissal of charges in no way weighed toward a finding of guilt as to the remaining codefendants. There is an "almost invariable assumption of the law that jurors follow their instructions," *Richardson v. Marsh*, 481 U.S. 200, 206 (1987), and Garrison has offered no reason to depart from this assumption here.

We conclude that there was sufficient evidence to sustain Garrison's conviction. We also conclude that there is no error here in the remedies the trial court crafted for the government's late disclosures or in the jury instructions the court gave regarding the abrupt departure of Yoon and Lim, and the dismissal of some charges against Nguyen.

**AFFIRMED.**