**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

FRANCISCO MUNA
TYDINGCO,
*Defendant-Appellant*.

No. 17-10023

D.C. No.
1:15-cr-00018-RVM-2

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

LILI ZHANG TYDINGCO,
*Defendant-Appellant*.

No. 17-10024

D.C. No.
1:15-cr-00018-RVM-1

OPINION

Appeals from the United States District Court
for the District of the Northern Mariana Islands
Ramona V. Manglona, Chief Judge, Presiding

Argued and Submitted October 16, 2018
San Francisco, California

Filed November 27, 2018

Before:  Sidney R. Thomas, Chief Judge, Susan P. Graber, Circuit Judge, and Robert S. Lasnik,[*] District Judge.

Opinion by Judge Graber

---

## SUMMARY[**]

---

### Criminal Law

The panel reversed Lili Tydingco's conviction for harboring an illegal alien, reversed Francisco (Frank) Tydingco's conviction for aiding and abetting the harboring, and remanded for a new trial.

The panel held that the evidence—viewed in the light most favorable to the government—is sufficient for a rational trier of fact to find that Lili harbored an illegal alien and that Frank had the specific intent to facilitate Lili's commission of that crime.

The panel held that the instruction defining "harbor" was erroneous because it did not require the jury to find that the defendants intended to violate the law, and the error was not harmless.

---

[*] The Honorable Robert S. Lasnik, United States District Judge for the Western District of Washington, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held that the instruction defining "reckless disregard" was plainly erroneous because it did not require the jury to find that Lili subjectively drew an inference that the alien was, in fact, an alien and was in the United States unlawfully. The panel held that the instruction may have affected the outcome of the trial, and the error constitutes a miscarriage of justice, warranting a new trial, because the jury could have convicted the defendants on an invalid legal theory.

## COUNSEL

Steven P. Pixley (argued), Saipan, Commonwealth of the Northern Mariana Islands, for Defendant-Appellant Francisco Muna Tydingco.

Bruce Berline (argued), Berline & Associates LLC, Saipan, Commonwealth of the Northern Mariana Islands, for Defendant-Appellant Lili Zhang Tydingco.

Garth R. Backe (argued), Assistant United States Attorney; Shawn N. Anderson, United States Attorney; United States Attorney's Office, Saipan, Commonwealth of the Northern Mariana Islands; for Plaintiff-Appellee.

## OPINION

GRABER, Circuit Judge:

Defendants Lili and Francisco ("Frank") Tydingco stand convicted, respectively, of harboring an illegal alien and of aiding and abetting the harboring, in violation of 8 U.S.C.

§ 1324(a)(1)(A)(iii).  On appeal they argue, first, that the evidence was insufficient to support their convictions.  We disagree and, therefore, reach their additional arguments concerning trial error.  We hold:  (1) the instruction defining "harbor" was erroneous because it did not require the jury to find that Defendants intended to violate the law, and the error was not harmless; and (2) the instruction defining "reckless disregard" was plainly erroneous because it did not require the jury to find that Lili subjectively drew an inference that the alien was, in fact, an alien and was in the United States unlawfully; the instruction may have affected the outcome of the trial, and the error constitutes a miscarriage of justice, warranting a new trial, because the jury could have convicted Defendants on an invalid legal theory.  Accordingly, we reverse and remand.

FACTUAL AND PROCEDURAL BACKGROUND

In September 2013, Defendants traveled from their home on Saipan in the Commonwealth of the Northern Mariana Islands ("CNMI") to China, Lili's native country, with their two children.  Lili is a legal permanent resident of the United States through her marriage to Frank.  While in China, Defendants met X.N.'s father, who asked Defendants to take 10-year-old X.N., a Chinese national, home with them to attend school in the United States.  Lili contacted a friend of hers who knew someone who had brought a child to the United States to study in the past, and the friend told Lili that it was possible to bring X.N. to the United States.

Defendants returned to the CNMI with X.N. on September 26, 2013.  The CNMI has a "parole" program designed to support its tourism industry.  Pursuant to this program, Chinese and Russian nationals may enter the CNMI

without a visa and stay for up to 45 days. United States Customs and Border Protection ("CBP") requires proof of a ticket booked on a return flight within the 45-day window before an alien may "parole in" to the CNMI.

At immigration control in the Saipan airport, CBP sent Lili and X.N. to "secondary processing" for a more thorough investigation because X.N. was a minor traveling without her parents. Lili presented a notarized letter of authorization from X.N.'s parents stating that Lili and Frank would be X.N.'s guardians during her studies in the United States. She also told the CBP officer that they were going to "see how it would work out having X.N. stay with [us] and go to school." The officer told Lili to get the authorization letter stamped at the local police station, but otherwise said nothing about X.N.'s attending school on Saipan. At some point during processing, Lili or X.N. showed proof that X.N. had a return flight to China booked for October 28, 2013. The parole program allows a seven-day buffer from the date of a return ticket to account for problems that might prevent a flight from departing as scheduled, so the officer stamped the I-94—a paper record of entry and departure dates—in X.N.'s passport with "Nov 04 2013" to indicate that X.N. had to leave the CNMI by November 4.

After passing through immigration control, Defendants and X.N. went through customs. Frank filled out a customs declaration form for his family and X.N. In the section that asked about the purpose of the trip, Frank filled in the bubble for "Returning Resident." He filled in only the CNMI bubble in the section that asked for country of permanent residence, but he also wrote X.N.'s name under "Travelers," provided her correct passport number, and listed China as her country of citizenship.

About two weeks after returning to Saipan, Defendants enrolled X.N. in public school.  Lili stated that she did not apply for a student visa for X.N. because the school never asked for one; Lili simply gave the school a copy of X.N.'s passport and the authorization letter.  Defendants also filled out other forms to enroll X.N. in school, including a consent to disclose X.N.'s directory information and a hand-drawn map accurately depicting the location of their house relative to the school.

X.N. lived with Defendants until February 2015.  After X.N. left her home, Lili voluntarily spoke to an agent from Homeland Security and signed a written statement.  The statement acknowledged that Lili understood "that there are immigration laws" and that she "had to follow certain steps and pay certain fees" to obtain her green card.  Lili also said that she "had [X.N.]'s passport and saw the I-94 showing she was paroled in until November 2013."  An agent present for Lili's interview testified, on cross-examination, that the interviewing agent did not ask Lili if she knew what an I-94 was.  He could not recall whether the interviewer asked Lili if she knew what a student visa was.  The agent also testified that Lili said she knew what "being paroled in" meant.  The government indicted Defendants after Lili's interview.

Defendants moved for acquittal after the close of the government's case.  The district court denied both motions.  Following their convictions, Defendants timely appeal.

## DISCUSSION

### A.  *Sufficiency of the Evidence*[1]

Only Lili's mental state was truly in dispute at trial.  Lili admitted seeing X.N.'s I-94 and the mandatory departure date of November 4, 2013 (indeed, Lili personally brought X.N. through immigration control), yet Lili kept X.N. in her house long after that mandatory departure date passed.  Lili also understood that the United States has immigration laws, and she understood that obtaining legal status (as she did) requires an alien to follow certain procedures.  The evidence also showed that Lili expected to be paid for keeping X.N. in the family home.  On this record, a rational juror could have found that Lili knew that X.N.'s continued presence in the United States was unlawful after November 4, 2013, and that Lili intended to violate the immigration laws.

With respect to Frank, the fact that he was named as a guardian in the Chinese letter of authorization from X.N.'s parents is circumstantial evidence tending to show that he actively participated in the plan to bring X.N. to the CNMI for a period longer than is authorized by law.  And as the district court observed, Frank knew that, when X.N. came to Saipan, she had a return ticket to China booked for October 28, 2013, within the parole period.  A rational juror could conclude that Frank intended to give X.N. a place to live long

---

[1] We review de novo the sufficiency of the evidence.  *United States v. Garrison*, 888 F.3d 1057, 1064 (9th Cir. 2018).  In doing so, we view the evidence in the light most favorable to the government and ask whether a rational trier of fact could have found that the government proved the essential elements of the crime beyond a reasonable doubt.  *Id.* at 1063.  In analyzing the sufficiency of the evidence, we apply the legal principles that we hold, below, are required to instruct a jury properly.

after her parole period ended and that he had a financial motive for doing so: Defendants' family had modest income, and Frank was an active participant in what occurred. For example, he flew to China with Lili to bring X.N. back to Saipan, he filled out the customs form at the border, and he enrolled X.N. in school.

In short, the evidence—viewed in the light most favorable to the government—is sufficient for a rational trier of fact to find that Lili harbored an illegal alien and that Frank had the specific intent to facilitate Lili's commission of that crime. Therefore, Defendants are not entitled to outright reversal of their convictions. We turn, then, to Defendants' claims of instructional error and their request for a new trial.

B.  *The Meaning of "Harbor" and the Necessary Mens Rea*[2]

Title 8 U.S.C. § 1324(a)(1)(A)(iii) criminalizes the conduct of any person who:

> knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation.

---

[2] We review de novo whether a jury instruction misstates a required element of a charged offense. *United States v. Hofus*, 598 F.3d 1171, 1174 (9th Cir. 2010). Ordinarily, such an error requires reversal unless it is harmless beyond a reasonable doubt. *United States v. Pierre*, 254 F.3d 872, 877 (9th Cir. 2001).

Here, the court instructed the jury simply that the term "harbor" "means 'to afford shelter to.'" The instructions did not include any requirement that the jury consider whether Defendants intended to violate the law. Defendants asked the court to instruct the jury that it had to find that they sheltered X.N. for the specific purpose of avoiding detection by immigration authorities. The court declined to give that proposed instruction. We hold that, although the court properly rejected Defendants' particular formulation, harboring instructions must require a finding that Defendants intended to violate the law.

In *United States v. Acosta de Evans*, 531 F.2d 428, 429 (9th Cir. 1976), we rejected the defendant's argument that "harbor" means "to harbor so as to prevent detection by law enforcement agents," in the context of considering the sufficiency of the evidence to sustain the defendant's conviction. In concluding that the evidence sufficed even though the defendant did not have the specific intent to prevent detection, we held that—as the court instructed here—"harbor" means "afford shelter to." *Id.* at 430. *Acosta* addressed an earlier version of the statute but, like the present statute, it criminalized "conceal[ing], harbor[ing], or shield[ing] from detection" an unlawful alien. *Id.* at 429 n.1. Textually, the *Acosta* holding comports with the list of prohibited acts, because one is guilty of the crime if one *either* "harbor[s]" *or* "shield[s] from detection." 8 U.S.C. § 1324(a)(1)(A)(iii). When Congress uses different terms in the same statute, we presume that each term has a distinct meaning. *SEC v. McCarthy*, 322 F.3d 650, 656 (9th Cir. 2003).

Nearly 30 years after *Acosta*, we decided *United States v. You*, 382 F.3d 958 (9th Cir. 2004). There, we held that jury

instructions on harboring an illegal alien "must require a finding that the defendants intended to violate the law." *Id.* at 966. The district "court instructed the jury that it must find that [the defendants] had acted with '*the purpose of* avoiding the aliens' detection by immigration authorities.'" *Id.* (brackets omitted). We held that the instruction "contained the necessary *mens rea* element" because it required the jury to find that the defendants acted with the required intent to violate the law. *Id.* Thus, an additional instruction that the defendants had requested would have been redundant. *Id.* In other words, we held that the instruction concerning a specific intent to avoid detection was sufficient, but we did not hold that it is necessary.

The government argues, first, that the statement in *You* concerning the required content of a jury instruction on intent was mere dictum, rather than a holding that we must follow. We are not persuaded. The opinion considered the question at some length, relying on two analogous decisions in which we held that a district court should have instructed the jury that it must find that the defendants intended to violate the law. *Id.* at 965–66. Moreover, the discussion was the sole analytical underpinning for the conclusion that an additional instruction was not needed. *See Barapind v. Enomoto*, 400 F.3d 744, 751 (9th Cir. 2005) (en banc) (per curiam) (footnote omitted) (explaining that an issue presented for review on appeal, which this court addressed and decided, "became law of the circuit, regardless of whether it was in some technical sense 'necessary' to our disposition of the case").

Next, the government asserts that we need not follow *You* because it was wrongly decided. Whether we agree with *You* or not, we are bound to follow it. *See Miller v. Gammie*,

335 F.3d 889, 899–900 (9th Cir. 2003) (en banc) (holding that a three-judge panel must follow a prior decision of this court unless it is "clearly irreconcilable" with the reasoning or theory of an intervening Supreme Court decision or other higher authority).

Finally, the government urges us to seek en banc rehearing because *Acosta* and *You* conflict irreconcilably. *See United States v. Torre-Jimenez*, 771 F.3d 1163, 1167 (9th Cir. 2014) (citing *Atonio v. Wards Cove Packing Co.*, 810 F.2d 1477, 1478–79 (9th Cir. 1987) (en banc)) ("Moreover, if we thought that two controlling cases were in irreconcilable conflict, we could not simply pick one to follow—we would be required to call this case en banc."). In our view, we can harmonize the two cases despite some tension between them.

*You* requires only an instruction that the defendant intended to violate the law. One way to demonstrate such an intention is to prove that the defendant sought to prevent immigration authorities from detecting an illegal alien's presence. But that is not the only way. For example, a defendant who chooses to publicize her harboring of an illegal alien in order to call attention to what she considers an unjust immigration law intends to violate the law, even though she does not intend to prevent detection. *See United States v. Dann*, 652 F.3d 1160, 1174 (9th Cir. 2011) (stating that "the government is correct" in interpreting *Acosta* to mean that it did not have to prove that the defendant "harbored [the alien] to prevent detection by immigration authorities"); *United States v. Aguilar*, 883 F.2d 662, 690 (9th Cir. 1989) (explaining that *Acosta* held that "'harbor' . . . does not require an intent to avoid detection").

In summary, the jury instructions were legally deficient by not requiring the jury to find that Defendants intended to violate the law. The omitted instruction was not harmless beyond a reasonable doubt, because it went to the heart of Lili's primary defense—that she did not understand the immigration laws and did not act with the intent to violate the law. Indeed, the government expressly concedes that, if the harboring instruction was erroneous, the error was not harmless. Frank's conviction rises or falls with Lili's in this respect, because his conviction for aiding and abetting cannot stand without her conviction for the underlying offense of harboring.

## C. *The Meaning of "Reckless Disregard"*

The district court instructed the jury that "reckless disregard" means "being aware of facts which, if considered and weighted in a reasonable manner, indicate a substantial and unjustifiable risk that" the person harbored was in fact an alien and was in the United States unlawfully. The government concedes that the instruction was plainly erroneous in light of *United States v. Rodriguez*, 880 F.3d 1151 (9th Cir. 2018).[3] *Rodriguez* held that reckless disregard requires that *the defendant herself* must be aware of facts

---

[3] When a defendant fails to object to an instruction below, we review for plain error. *United States v. Conti*, 804 F.3d 977, 981 (9th Cir. 2015). We may correct a plain error when: (1) there was error, meaning "a deviation from a legal rule that is not waived"; (2) the error is plain, "meaning 'clear' or 'obvious'"; (3) the error was prejudicial, meaning a "'reasonable probability'" exists that it "'affected the outcome of the district court proceedings'"; and (4) the error "'seriously affects the fairness, integrity, or public reputation of judicial proceedings.'" *Id.* (quoting *United States v. Olano*, 507 U.S. 725, 734, 736 (1993)).

from which an inference of risk could be drawn *and* the defendant must actually draw that inference. *Id.* at 1159–62.

The parties dispute whether the erroneous instruction, to which Defendants did not object at trial, prejudiced Defendants. Defendants bear the burden of showing prejudice, which requires some intermediate level of proof that the error affected the outcome at trial: more than a mere possibility, *United States v. Gonzalez-Aguilar*, 718 F.3d 1185, 1189 (9th Cir. 2013), but less than a preponderance of the evidence, *United States v. Dominguez Benitez*, 542 U.S. 74, 83 n.9 (2004). To determine whether the error affected the outcome, we consider the whole trial record, including "the strength of the evidence against" Defendants and "the arguments made by the parties." *United States v. Garrido*, 713 F.3d 985, 995 (9th Cir. 2013) (internal quotation marks omitted). We also consider "whether the defendant contested the omitted element 'and raised evidence sufficient to support a contrary finding.'" *United States v. Conti,* 804 F.3d 977, 982 (9th Cir. 2015) (quoting *Neder v. United States*, 527 U.S. 1, 19 (1999)). In sum, we must decide whether a reasonable probability exists that the jury would have found Lili not guilty[4] had the district court defined "reckless disregard" to mean: "*the defendant knew of* facts which, if considered and weighed in a reasonable manner, indicate a substantial and unjustifiable risk that the alleged alien was in fact an alien and was in the United States unlawfully, *and the defendant knew of that risk*." *See Rodriguez*, 880 F.3d at 1162 (providing a sample instruction).

---

[4] Frank's conviction for aiding and abetting cannot stand without Lili's conviction for the underlying offense, so the instruction necessarily prejudiced him if it prejudiced Lili.

Lili's mental state was the main disputed issue at trial. The government provided uncontested evidence of the other elements of harboring an illegal alien: that X.N. was an alien, that X.N. remained in the United States unlawfully, and that Lili afforded shelter to X.N. And the government offered strong evidence on the mental-state element: Lili brought X.N. through immigration control and saw the I-94 with a mandatory departure date of November 4, 2013, yet she kept X.N. in her home until 2015.

X.N. also had a return flight (that she never boarded) booked within the parole program's 45-day window. That reservation suggests that *someone* connected to X.N. knew the requirements of the parole program, but the evidence did not definitively show that Lili booked the flight or even knew about it.

Lili's defense strategy focused on sowing doubt about whether she knew (or knew of the risk) that X.N.'s continued presence on Saipan was unlawful. Through cross-examination and some of the government's exhibits, substantial evidence emerged from which a reasonable jury could infer that Lili—despite knowing of facts from which a reasonable person would infer the risk of X.N.'s presence being unlawful—did not *actually* draw that inference *herself*, as *Rodriguez* requires. 880 F.3d at 1160. Lili said that she consulted with a knowledgeable friend before agreeing to bring X.N. to the United States, and the friend told her that it was possible to bring a child to the United States to study. Lili also explicitly told a CBP officer, while going through immigration control, that X.N. would attend school on Saipan; she received no response to that information other than an instruction to have the authorization letter from X.N.'s parents stamped at the local police station.

Moreover, Lili gave the public school extensive documentation connecting herself to X.N.—something the jury could have inferred that she might not have done had she appreciated the facts of X.N.'s unlawful status. Among other things, Lili gave the school the authorization letter listing herself and Frank as X.N.'s guardians, a consent form to release X.N.'s directory information to the public, and a hand-drawn map showing precisely where Defendants lived. Lili also said that she never sought a student visa for X.N. because the school never asked for one and simply accepted X.N.'s passport and the notarized letter from her parents in China. One reasonable view of that evidence is that Lili did not realize that X.N. needed other documents to make her long-term presence in the United States legal.

In sum, Lili has shown more than a mere possibility that the jury would have reached a different verdict if properly instructed on reckless disregard. *Gonzalez-Aguilar*, 718 F.3d at 1189. But prejudice alone does not require reversal. We also must decide whether the error "seriously affects the fairness, integrity or public reputation of judicial proceedings" before exercising our discretion to correct the error. *Johnson v. United States*, 520 U.S. 461, 469–70 (1997) (brackets omitted) (quoting *United States v. Olano*, 507 U.S. 725, 736 (1993)).

Here, the jury might have relied on a legally invalid theory to convict Lili: that she acted in reckless disregard because a reasonable person, aware of the facts that Lili knew, would have understood the risk that X.N. remained in the country unlawfully—even if Lili herself did not understand that risk. The jury's "possible reliance on a legally invalid theory constitutes a miscarriage of justice which would seriously affect 'the fairness, integrity or public

reputation of judicial proceedings.'" *United States v. Vasquez-Hernandez*, 849 F.3d 1219, 1229 (9th Cir. 2017) (quoting *Garrido*, 713 F.3d at 998).

Accordingly, we hold that Defendants have met their burden under *Olano* to show that reversal and remand for a new trial is warranted.

**REVERSED** and **REMANDED.**